**M. T. HUMPHRIES et al., Appellants,**

**v.**

**TEXAS GULF SULPHUR COMPANY et al., Appellees.**

No. 24985.

United States Court of Appeals
Fifth Circuit.

April 9, 1968.

**70**

E. B. Votaw, Vidor, Tex., for appellants.

Thomas H. Lee, Jesse J. Lee, Houston, Tex., Major T. Bell, Ewell Strong, Samuel C. Lipscomb, Beaumont, Tex., Crawford Martin, Atty. Gen., Austin, Tex., George A. Weller, Beaumont, Tex., Joseph C. Brown, Houston, Tex., John P. Blair, Beaumont, Tex., Benjamin R. Powel, Galveston, Tex., W. Forrest Smith, Dallas, Tex., Preston Shirley, Galveston, Tex., James W. Lee, Houston, Tex., for appellees.

Before JONES, WISDOM and THORNBERRY, Circuit Judges.

THORNBERRY, Circuit Judge:

This diversity action proves that unlike old soldiers, expectant heirs never even fade away. It is one of a trilogy that hopefully will terminate the continuing battle between the heirs and the active users of the Humphries survey.[1] In deciding who owns the Humphries survey we must consider problems of Texas land law and more particularly that fascinating though somewhat abstruse part concerning the validity and effect of the ancient Spanish land grants that form the foundation for innumerable ownership rights in Texas. The land involved in this case, known as the Humphries survey, is located in Southeast Texas. It has made an enormous economic contribution to the state, primarily because of the famed Spindletop Oil Field discovered there is 1901. Appellees have claim to the land under rights that extend back to 1836, but the active use of the land is best documented from 1884. Despite these claims, the heirs argue that they deserve to share the land and mineral rights with appellees. Before discussing these demands, a skeletal history of the ownership of the land is helpful. On February 14, 1835, a land grant for

---

1. The other cases are Beasley v. McFaddin, Jr., 5 Cir. 1968, 393 F.2d 68; Green v. Texas Gulf Sulphur Company, 5 Cir. 1968, 393 F.2d 67. The history of the litigious nature of the Humphries heirs is documented in: Glover v. McFaddin, 5th Cir. 1953, 205 F.2d 1; Jones v. Mc- Faddin, 382 S.W.2d 277 (Tex.Civ.App.—Texarkana 1964, writ ref'd n.r.e.); Foster v. Gulf Oil Corp., 335 S.W.2d 845 (Tex.Civ.App.—Beaumont 1960, writ ref'd n.r.e.); McBride v. Gulf Oil Corp., 292 S.W.2d 151 (Tex.Civ.App.—Beaumont 1956, writ ref'd n.r.e.).

a league of land (4,428 acres) was issued by the Government of Coahuila and Texas to a colonist named "Pelham" or "William" Humphries. The next relevant conveyance is from William Humphries by general warranty deed to William Inglish on February 14, 1836, recorded in 1860 in Jefferson County. Next, the children or heirs of Inglish conveyed the land to W. P. H. McFaddin by deed dated December 31, 1883, recorded January 10, 1884. Texas Gulf Sulphur claims its rights to the mineral estate from conveyances and mineral leases made by McFaddin and his transferees.

All the appellants in the *Beasley*, *Green* and instant case claim as heirs of either "Pelham" or "William" Humphries. Each set of heirs has, however, a different theory to justify its demand for the land or minerals: In the instant case the assertion is that the land was granted to Pelham and not William Humphries and that all subsequent conveyances are therefore fraudulent; in the *Beasley* case the assertion is that the William Humphries who conveyed to Inglish was not the heir of Pelham and consequently had nothing to convey; finally, the *Green* case presents the issue of whether a tax deed in 1850 vested title to the land in the State of Texas. Although these assertions will be considered separately, what is said here is also dispositive of the *Beasley* and *Green* appeals.

Appellants in the instant case claim only a mineral interest in the land. They have mounted a vigorous attack on the entire chain of title based on numerous technical points of Texas land law and the general history of Texas from 1836 to the present. Their main point is that the original grant in 1835 was to Pelham and not William Humphries. The basis for this contention is that in the original grant the colonist named throughout is Pelham, except that in the first line the name "William" has been interlined over the name "Pelham." That interlineation has generated all the controversy surrounding this land. The thrust of appellants' argument is, therefore, that all

subsequent conveyances have been fraudulent and that the land at all times has remained in the Pelham Humphries family. Appellees have offered evidence that the colonist was in fact William Humphries. This was done by connecting various events surrounding the original grant in order to identify the original grantee. They showed that on September 24, 1834 a certificate of character was granted to a man named William Humphries; that it was a man named William Humphries who signed a bond of title obligating him to convey the land to Inglish; and that it was a William Humphries who received the labor of land (170 acres) that went only to the man who got the original grant. From these facts appellees urged that since it is agreed that only one valid grant was issued to a man named Humphries, it is more reasonable to conclude that his name was William.

Appellants also attacked the deed from William Humphries to Inglish as a forgery. Another conveyance which adds further mystery to the ownership rights to this land is also challenged as a forgery. This conveyance is for the same tract of land described in the Inglish deed and is from Pelham Humphries to Snively on September 7, 1857, recorded in Jefferson County, January 5, 1861. The court below rejected all of appellants' claims and granted summary judgment for appellees, reasoning that whether the land was granted to Pelham or William, the deeds from William Humphries to Inglish and from Pelham Humphries to Snively were valid and divested any Humphries heirs of title. Its decision was based on the fact that affidavits of forgery filed by appellants did not impeach either deed since the affidavits were based on belief and presented no admissible factual evidence to sustain the plea. The court also concluded that appellees gained title to the land by adverse possession.

Another basis also utilized by the district court permits affirmance of the summary judgment without immersing this Court in the factual thicket sur-

rounding the controversy. Thus we affirm the summary judgment because the absolute non-use of and non-claim to the land by appellants and their predecessors for more than 125 years, when measured against appellees' active use and claim, justify the imposition of a conclusive presumption that all the Humphries heirs have lost their title. We adopt this approach because it is the one that Texas courts have taken recently in dealing with problems of ownership rights based on old Spanish land grants. These cases establish a rule that acquiescence by a former owner and his descendants in the possession and assertion of ownership of land on the part of another affords a basis for finding that title passed to the possessor by deed or otherwise. Moreover, creation of this presumption of the passage of title provides an excellent shorthand way to put a judicial stop to the Pelham Humphries litigation. These endless suits have been an harassment to the land and mineral owners as well as a useless expense of time and money by litigants and courts. Finally, the facts of this case are peculiarly suited to the creation of a conclusive presumption. Our brief encounter with this litigation has uncovered a controversy so complicated, conflicting and confusing that no one will ever really know the exact history of the land. Indeed, courts have been rather ambivalent about who got the land. There are decisions that indicate the grant was to Pelham, Glover v. McFaddin, 5th Cir. 1953, 205 F.2d 1, while others support the assertion that the grant was really to William, McBride v. Gulf Oil Corp., 292 S.W.2d 151 (Tex. Civ.App.—Beaumont 1956, writ ref'd n. r. e.). The death of Pelham Humphries is also a mystery. The Glover court said he died in 1835; there is evidence in the *Beasley* case that he died in 1837 or 1838; and in the instant case there is an intimation that he was still alive in 1866. Consequently, attention will now be directed to the Texas decisions to ascertain when and why this presumption arises.

Texas courts have created a conclusive presumption that an heir is without title on numerous occasions. The decision of Page v. Pan American Petroleum Corp., 381 S.W.2d 949 (Tex.Civ.App.—Corpus Christi 1964, writ ref'd n. r. e.) provides a good illustration. There the grant was issued in 1829 to the mother of J. W. P. and S. H. P. The mother later died intestate in 1833, leaving her sons as heirs. In 1839, by a deed recorded in 1840, J. W. P. conveyed all of his right, title, and interest in the land to Sweeny. As there was no record of a conveyance out of S. H. P., the plaintiffs claimed to have inherited his half interest. The defendants claimed record title from Sweeny and the J. W. P. deed. They asserted that the long and notorious claim of title and dominion, payment of taxes, and the long acquiescence of plaintiffs and those under whom they claimed established as a matter of law that in some manner the title now asserted had passed from plaintiffs' ancestors and was now owned by them. The court agreed with this argument and granted summary judgment for the defendant. It reasoned that the long nonassertion of claim to the land could only be explained by a conveyance from plaintiffs' ancestors, either by an oral conveyance, lost deed, or an unrecorded deed. By granting summary judgment, the court made the presumption irrebuttable:

However, as to whether an issue of fact or a question of law is presented depends upon the entire record of each case. And when, as in the present case, the record clearly presents a situation where, in the total absence of any facts to the contrary, reasonable minds could reach no other conclusion but that the long continued and undisturbed possession and claims of title, acquiesced in by plaintiffs' ancestor from whom they claim for over fifty years and by his descendants for another sixty years, could be explained only by the presumption of an unrecorded conveyance, the court will pre-

sume such a conveyance as a matter of law.

381 S.W.2d 949, 954.

The facts of the instant case justify application of the holding in *Page*. When McFaddin got the grant from Inglish, he fenced the entire league except the side on the Neches River. He used the land for farming and pasturing; built a ranch house and tenant house; made other improvements; and he and his descendants have remained on the land from 1884 until the present. In 1900, the land was leased to Lucas, who in 1901 brought in the "Lucas Gusher" that started the Spindletop oil production. This oil production still continues. In 1956, Texas Gulf Sulphur started sulphur production. Presently there are seventy-five wells. Thus it is apparent that from 1884, there have been eighty years of uninterrupted possession and continuous use of the land. Appellees and their predecessors have also paid all the taxes. In stark contrast to this productive use is the absolute non-claim and inactivity by appellants for more than 125 years. Indeed, there is no evidence that appellants or their predecessors ever had possession of the land, paid any taxes, exercised any dominion over the land, or even asserted a claim to it. Nor is there any evidence to suggest that the conveyances presumed were not in fact made. All appellants have done is attempt to impeach all the known conveyances in order to prove that Pelham Humphries never parted with the land so that it descended to them. It would seem that this evidence really suggests that all concerned have treated this Inglish deed as valid; however, even excluding this deed from consideration, there is not one shred of evidence to rebut the presumption that Pelham or William Humphries made other conveyances. Accordingly, as in *Page*, reasonable minds could reach no other conclusion but that the non-claim by appellants can only be explained by the presumption of an unrecorded conveyance. At this late date, when the occupiers have acquired the general reputation of being owners of the land by paying the taxes, using the land, and have had their title recorded in the county where the land is located for so long, it would be unconscionable to award the heirs the land and minerals based on the evidence presented to the district court. See Purnell v. Gulihur, 339 S.W.2d 86 (Tex.Civ.App.—El Paso 1960, writ ref'd n. r. e.).

■ The *Page* decision gives cogent policy reasons for our holding:

'Since it is not consistent with human experience for one really owning property of value to assert no claim thereto, but to acquiesce for a long period of time in an unfounded, hostile claim, the rule is sound which permits the inference that an apparent owner has parted with his title from evidence, first, of a long-asserted and open claim, adverse to that of the apparent owner; second, of a non-claim by the apparent owner; and third, of acquiescence by the apparent owner in the adverse claim.

'The rule is essential to the ascertainment of the very truth of ancient transactions. Without it, numberless valid land titles could not be upheld. Its application becomes more and more important with the passing years, as it becomes more and more difficult to get living witnesses to that which long ago transpired.' Magee v. Paul, 110 Tex. 470, 221 S.W. 254, 256.

381 S.W.2d 949, 952.[2]
Further support is found in the decisions indicating that Texas courts are disposed to extend rather than restrict the application of the presumption of a deed, Duke v. Houston Oil Co. of Texas, 128 S.W.2d 480 (Tex.Civ.App.—Beaumont 1939, writ ref'd n. r. e.), because it is more reasonable to conclude, after

2. See Page v. Pan American Petroleum Corp., 412 S.W.2d 797 (Tex.Civ.App.—Houston 1967, writ ref'd n.r.e.); Bordages v. Stanolind Oil & Gas Co., 129 S.W. 2d 786 (Tex.Civ.App.—Galveston 1938, writ dism'd judgmt. cor.); Surghenor v. Ducey, 139 S.W. 22 (Tex.Civ.App.—Galveston 1911, writ dism'd).

those who know the facts are dead, that the ones who are in the enjoyment of the property and have remained there for a long time have better right to it. See *Bordages*, supra at 792. This extension has been viewed by some courts as consistent with the public policy of the state as expressed in Vernon's Ann.Tex.Rev. Civ.Stat. art. 5519a (1958):

> In all suits involving the title to land not claimed by the State, if it be shown that those holding the apparent record title thereto have not exercised dominion over such land or have not paid taxes thereon, one or more years during the period of twenty-five years next preceding the filing of such suit and during such period the opposing parties and those whose estate they own are shown to have openly exercised dominion over and asserted claim to same and have paid taxes thereon annually before becoming delinquent for as many as twenty-five years during such period, such facts shall constitute prima facie proof that the title thereto had passed to such persons so exercising dominion over, claiming and paying taxes thereon.

> Sec. 2. This Act shall in no way affect any Statute of Limitation or the right to prove title by circumstantial evidence under the present Rule of Decision in the Courts of this State nor to suits between trustees and their beneficiaries nor to suits now pending. Acts 1930, 41st Leg., 5th C.S., p. 162, ch. 30: Acts 1931, 42nd Leg., p. 288, ch. 169.

This statute suggests another way by which the apparent owners to property can be divested of title and it is independent of both the adverse possession statutes and the presumption-of-a-deed doctrine. It is clear from the face of the statute that appellees have brought themselves squarely under its panoply and are entitled to its protection. Love v. McGee, 378 S.W.2d 96 (Tex.Civ.App.—Texarkana 1964, writ ref'd n. r. e.); Purnell v. Gulihur, supra, 339 S.W.2d at 91; Duke v. Houston Oil Co. of Texas, supra, 128 S.W.2d at 486.

Underpinning all these decisions is the salutary policy that courts should seek to quiet title to land, especially where the land has been claimed a long time and where it is difficult to ascertain if the user has complete record title. See Purnell v. Gulihur, supra, 339 S.W.2d at 92; Bordages v. Stanolind Oil & Gas. Co., supra, 129 S.W.2d at 791. *Page* indicates that in situations like the present one, this policy is best implemented by awarding the land to the users who have made it economically productive. It is simply not rational to assume that more than 125 years would have passed without a claim being made to the land if there were any substance to the claims. Such a policy is anchored on a practical and correct view of human nature, as reflected by the Texas cases, that men seldom have rights of value which are unknown to them, and more seldom still will men suffer themselves to be deprived of the enjoyment of these rights for any length of time. It also prevents time, which should heal the scars on title, from gradually undermining the title to land. Perhaps the best summation for all that has been said is found in the expressive opinion of Judge Simonton in United States v. Devereux, 4th Cir. 1898, 90 F. 182, 187:

> After this great lapse of time, courts will presume anything and everything to have been done which, if done, would be a bar to the claim. Id. 869; Roe v. Ireland, 11 East, 280. This rule of presumption is one of policy as well as of convenience, and necessary for the peace and security of society. 'If time,' said Lord Plunkett, 'destroys the evidence of title, the law has wisely and humanely made length of possession a substitute for that which has been destroyed. He comes with a scythe in one hand to mow down the muniments of our rights, but in his other hand the lawgiver has placed an hourglass, by which he metes out incessantly those portions of duration which render needless the evidence he has swept away. Whart Ev. ¶1338, note 5.'

It is not necessary to presume that a deed was, in point of fact, executed. It is sufficient if the evidence leads to the conclusion that a conveyance might have been executed, and that its existence would be a solution of the difficulty arising from its mere execution. Fletcher v. Fuller, 120 U.S. 534, 546, 547, 7 S.Ct. 667, 30 L.Ed. 759; McLeod v. Rogers, 2 Rich.Law, 22. Presumption does not operate like the statute of limitations, and bar a right which is known to exist; or like laches, which deprives one of a right which did exist. It operates as evidence, and establishes the conclusion that the right which did exist has been duly relinquished by the possessor of it.

For these reasons, the failure of appellants and their predecessors to assert any claim to the land, to use it, or pay the taxes confirms that the original Humphries grantee, whether his name was Pelham or William, at some time in the past parted with title.

■■ This holding is not aborted by the final point raised by appellants. They assert that the Spanish land grants never vested the mineral interest in the owners of the land and thus that appellees' occupancy of the surface can give them no claim to the minerals. Appellants have correctly noted that at the time the grant was made to Humphries the Mexican Government retained the rights to the minerals. After the Texas Revolution, this mineral interest vested in the Texas Government by right of conquest. Then in 1866, by constitutional amendment the Texas Government released to the owners of the soil the right to the mineral interest. Appellants interpret this historical background as proving that they, as the heirs of Humphries, became entitled to the mineral interest. Essentially they contend that when Humphries conveyed to Inglish, the latter did not get the mineral interest. Next, since the surface and mineral estates were severed and were of equal dignity, the amendment of 1866 could not accomplish a merger of the estates. Consequently, the mineral interest did not go to Inglish in 1866, but instead back to Humphries. Although it is a novel and provocative argument, it has been unanimously rejected. See Jones v. McFaddin, 382 S.W.2d 277 (Tex.Civ.App.—Texarkana 1964, writ ref'd n. r. e.) and cases cited therein; Masterson, Severance Of The Mineral Estate by Grant Of Land By the Sovereign and Adverse Possession, 30 Texas L.Rev. 321 (1952). These authorities indicate that the common-law doctrine of merger does not apply to a constitutional amendment and that the very purpose of the 1866 amendment was to assure that the owner of the surface came to hold the general title precisely as the general title was held prior to the first grant and to quiet title by barring the assertion of ancient rights under a multiplicity of technical claims.

The Pelham Humphries litigation is over and the Humphries heirs have no title in the league of land.

Affirmed.