866 P.2d 311

**EL PASO PRODUCTION COMPANY, et al., Plaintiffs–Appellees, and Cross–Appellants,**

v.

**PWG PARTNERSHIP, et al., Defendants–Appellees,**

v.

**Steve J. ABRAHAM, Personal Representative of the Estate of Roseline Abraham, and Steve J. Abraham, Michael C. Abraham and Diane Abraham Hinkle, individually and as surviving children of Roseline Abraham, deceased, Defendants–Counterclaimants–Appellants and Cross–Appellees.**

No. 20210.

Supreme Court of New Mexico.

Dec. 1, 1993.

Rehearing Denied Jan. 3, 1994.

The Payne Law Firm, P.C., H. Vern Payne, Robert M. Hall, Douglas W. Decker, Albuquerque, Roberts & Jolley, Val R. Jolley, Farmington, for appellants and cross-appellees.

Modrall, Sperling, Roehl, Harris & Sisk, P.A., John R. Cooney, R.E. Thompson, Lynn H. Slade, Albuquerque, for appellees and cross-appellants.

Gallegos Law Firm, P.C., J.E. Gallegos, Michael L. Oja, David Sandoval, Santa Fe, for appellees PWG Partnership, Graham Royalty & Ltd., and Prudential–Bach, et al.

Montgomery & Andrews, P.A., Walter Melendres, R. Michael Shickich, Santa Fe, for appellee Freeport–McMoran, Inc.

## OPINION

RANSOM, Chief Justice.

The Abraham family appeals from a declaratory judgment in an action brought by El Paso Production Company (El Paso) to determine the validity of an option contract and ownership of the right to repurchase gas rights under a federal oil and gas lease. El Paso cross-appeals from an amended judgment wherein the district court reduced a sanction for contempt of court from $24,000 to $300. On the Abrahams' appeal we affirm the decision of the court below, but on the cross-appeal we reverse and remand for entry of judgment that conforms to the findings of fact.

*Facts regarding ownership.* In the late 1940s and early 1950s, Mike and Roseline Abraham, along with Mike Abraham's brother and sister-in-law, J.R. and Dorothy Abraham, acquired several federal oil and gas leases in the San Juan Basin of northwestern New Mexico. Mike and Roseline held record title to eight of the ten leases involved in this litigation, and J.R. and Dorothy held record title to the other two. In 1951, the Abrahams agreed to sell to General American Oil Company of Texas one-half of their interest in the leases. Under this agreement, General American was to provide for the development of the oil and gas and to advance or "carry" the Abrahams' expenses associated with this development. These "carried working interest" expenses would then be paid from the profits attributable to the Abrahams' retained interest.

In 1952, General American assigned its interest to El Paso Natural Gas Company (the parent company of El Paso Production Company). On September 25 and 26, 1952, Mike and Roseline, as sellers, and El Paso Natural Gas, as buyer, executed an oil and gas lease sale agreement known as GLA–59.

Mike and Roseline agreed to sell to El Paso Natural Gas their remaining carried working interests in the leases described above for $925,000. In the agreement, the Abrahams reserved from the sale all existing royalties and overriding royalties, all oil under the leased lands, and all liquid hydrocarbons extracted from the gas by field separators. The Abrahams also reserved the right to repurchase the leases for a cash payment of $25,000 after El Paso Natural Gas had produced 30,000,000 mcf of gas from their interest plus enough gas to cover the costs of development and production under the original General American contracts. This repurchase option agreement is the subject of the current litigation.

GLA–59 was recorded in the land title records of San Juan and Rio Arriba Counties and the assignments of the individual leases were executed in 1953. In May 1963, the Abrahams sought to pay off debt and to consolidate their San Juan Basin oil and gas interests, including the GLA–59 reserved interests. To secure financing of $1.5 million dollars from Chemical Bank Trust Company of New York, Mike and Roseline reorganized one of their corporations, Universal Minerals, to which were transferred their reserved oil and gas interests and those of J.R. and Dorothy. Chemical Bank paid most of the proceeds from the financing to named creditors of Mike and Roseline, Universal Minerals, and J.R.

Mike and Roseline signed a transfer agreement of May 29, 1963 that included a description of the following GLA–59 oil and gas assets transferred to Universal Minerals:

7. Carried working interests in the 30–6 Unit, Rio Arriba County, New Mexico (reference is made to Exhibit "B" of the 30–6 Unit Agreement for a complete description of said interests.)

8. Carried working interests in the 31–6 Unit, Rio Arriba County, New Mexico (reference is made to Exhibit "B" to the 31–6 Unit Agreement for a complete description of said interests.)

J.R. and Dorothy ratified the agreement in order to merge any retained interests into that transaction. Universal Minerals simultaneously became Rincon Oil & Gas Corporation, with Mike Abraham owning 80% of the stock and an option to purchase the remaining 20% from W.H. Hudson, a corporate manager who had been hired to manage Rincon until Chemical Bank was repaid the outstanding loan amount. On June 3, 1963, Mike and Roseline executed a conveyance to Rincon describing six leases in GLA–59. *Apparently, Mike and Roseline may have failed to execute conveyances for the two leases remaining in their names, and J.R. and Dorothy may have executed no conveyances.*

In 1964, Mike Abraham was forced into bankruptcy. He signed under oath the schedule requiring the identification of all assets he owned. The schedule did not include any assets in the GLA–59 leases, but did include Abraham's 80% ownership in Rincon's stock and his option to purchase the outstanding stock. Abraham sought confirmation of a reorganization plan to sell Rincon to another corporation, stating that

Rincon also owns an undivided working interest in oil production and liquid hydrocarbon production covering several thousand acres of lands in T30N R7W, T30N R6W, and T32N R8W. In addition to owning the oil rights in said acreage, Rincon owns an option (at such time as El Paso Natural Gas Company has produced and saved from the lands subject to the agreement gas attributable to the interest of Rincon in a total amount of 30,000,000 mcf, together with an amount of gas sufficient to reimburse El Paso for all production, development, and operating costs) to repurchase all of the interests sold to El Paso Natural Gas Company for the sum of $25,000 in cash.

The bankruptcy court did not approve this plan, but it did approve the sale in 1966 of all of the bankruptcy estate's interest in the Rincon stock to Chemical Bank in discharge of $2 million of debt. No one raised objections to the sale.

At trial, the district court received evidence that Mike Abraham had knowledge during the bankruptcy proceedings that the option to repurchase the gas leases could ripen as early as 1972. In July 1973, PWG Partnership contracted with Rincon (now

owned by Chemical Bank) to purchase all of Rincon's interests in all oil and gas properties and estates. Rincon made both a specific and a general conveyance to PWG, with the general conveyance transferring:

> All leasehold ... interests ... and other interests in oil, gas and other liquid hydrocarbons owned and held by Grantor in any lands located within the Continental limits of the United States of America, and any contracts ... and other instruments which relate thereto....

The district court heard testimony that, while Mike Abraham was a brilliant and astute oil and gas investor, he had terrible record-keeping skills, and the general conveyance was intended to pick up all interests not covered by specific conveyances. Beginning in June 1976, El Paso Natural Gas began paying PWG for liquid hydrocarbons extracted from gas under the GLA–59 leases. Mike Abraham died in 1985. El Paso Natural Gas assigned its interests in the leases to El Paso in 1986. In the summer of 1989, PWG attempted to exercise its option to repurchase the gas leases, believing that the conditions precedent had been met. When Abrahams' attorney Thomas Hartnett III (who had represented Mike in the bankruptcy and both Mike and Roseline in the reorganization of Universal Minerals) heard of PWG's claim, he informed Roseline and her children, who then also laid claim to the option. This suit ensued.

*Findings and conclusions of the trial court.—The option to repurchase.* After many motions for summary judgment and a full trial on the merits to determine the ownership of the option, the trial court first concluded that the option to repurchase was valid and enforceable against El Paso. This law of the case has not been challenged on appeal *unless* this Court reverses the decision on ownership and finds that the Abrahams own the option, in which case El Paso has raised several arguments challenging the trial court's conclusion on validity.

The trial court found that the agreement of May 29, 1963, in which both Abraham brothers and their wives agreed to transfer to Rincon their carried working interests in the GLA–59 leases, was ambiguous because all "carried working interests" had already been assigned to El Paso Natural Gas. The court then looked to the referenced Exhibit "B" for a description of the interests in order to ascertain what the Abrahams were agreeing to convey. That exhibit listed only the leases and a variety of oil and gas rights. There was no language in the agreement or in the exhibit· limiting the scope or rights to be conveyed to Rincon. The court determined from the four corners of the agreement that the phrase "carried working interests" clearly referred and must have been intended to refer to "rights in or to the oil and gas" in a given lease. The court decided ·that the agreement of May 29, 1963 intended to transfer all rights that remained in the leases, which consisted of the reserved oil and liquid hydrocarbon rights and the option to repurchase the gas leases. The court buttressed its interpretation by noting that the conduct of the parties after the transfer was consistent with that interpretation. Specifically, Mike Abraham, J.R. Abraham, Hartnett, Hudson, Chemical Bank, El Paso Natural Gas, and the bankruptcy trustee all accepted and acted for some twenty-six years upon the notion that those rights had been transferred to Rincon. Finally, the court concluded that the conveyance of June 3, 1963 spoke in terms of conveying all of Mike and Roseline Abraham's "right, title, interest, claim and demand in and to the oil and gas properties," and determined that the conveyance, from its explicit language, was intended to pass, in the way of oil and gas rights, everything that was able to be transferred as to a mentioned lease, and that "gas rights" included the right to buy back the gas production in a given lease on the happening of a certain event. (In the alternative, the court found that since the option to repurchase benefitted only the holder of the reserved oil rights, that option was a covenant running with the oil and liquid hydrocarbons and passed with the conveyance of the oil and liquid hydrocarbons in that lease.)

*—The leases for which there was no conveyance documentation.* The trial court found that the Abrahams agreed to convey to Universal Minerals (Rincon), and that Chemical Bank (and, later, PWG) paid for the

conveyance of the Abrahams' interests in all ten of the leases described in the GLA–59 agreement, even though PWG only could produce conveyances for six leases. The court found that because of the scant documentation provided by Mike Abraham and because at the time of the agreement Rincon had no separate counsel who could check to be sure that all conveyances had been made, the general conveyance from Rincon to PWG purported to convey all assets of every kind, both documented and undocumented. Further, the court found that because oil and gas resources are subject to permanent depletion, an owner must diligently act upon his rights in order to avoid loss of the resource. These facts, together with PWG's long-continued possession of the rights with no objection or challenge from the Abrahams, led the court to believe that Mike Abraham was telling the truth in his bankruptcy—that all necessary conveyances had been made such that he and his wife held no legal or equitable title in the leases. The court then invoked a property rule that presumed a grant from Mike and Roseline Abraham and J.R. and Dorothy Abraham for the four leases that had been included in the transfer agreement but for which there was no conveyance documentation. Under that presumption, the court assumed that "all that might lawfully have been done to perfect legal title was in fact done, and in the form prescribed by law."

—*Alternative findings and conclusions.* In the event of reversal by this Court, the district court made alternative findings and conclusions. The court found that PWG should be granted legal title to the leases under the doctrine of equitable conversion. The court also found that the Abrahams and their heirs were judicially estopped from laying claim to the interests because of the sworn testimony to the bankruptcy court that the Abrahams did not own the interests because they had been sold to Rincon. Finally, the trial court found that judicial estoppel also should apply because the Abrahams had received $1.5 million for those interests plus forgiveness of debt in the bankruptcy action in exchange for the sale of the assets to Rincon. The court stated that to recognize the Abrahams' claim to the interests now

"would be playing fast and loose with, and subverting, the system of justice."

*Issues in the Abrahams' appeal.* Finding them dispositive, we address only two of the Abrahams' claims of error: that the district court erred in ignoring the intent of the parties to GLA–59 that the 1952 option to repurchase was personal to Mike and Roseline Abraham, and that the district court erred as a matter of law in applying the doctrine of presumed grant to divest Roseline Abraham of her right to the unconveyed leases.

Because we believe that the court correctly interpreted the contract and correctly applied the doctrine of presumed grant, the alternative findings and conclusions are not relied on, and error claimed in that regard will not be addressed. Likewise, because the court found that the option to repurchase passed to Rincon in the conveyances and agreement of May 29, 1963, all of which were signed by Roseline Abraham, questions as to due process and equal protection (by taint from the acts of her husband) are not applicable—Roseline Abraham clearly conveyed her rights in the option to Rincon. Finally, determining that Roseline Abraham did not have a right to a jury trial because all relief requested was equitable, we find no merit in the argument that the trial court erred in refusing to grant a jury trial. *See Evans Fin. Corp. v. Strasser,* 99 N.M. 788, 789, 664 P.2d 986, 987 (1983) ("If the remedy sought is legal, parties are entitled to a jury trial; if the remedy sought is equitable, there is no jury trial as of right.").

■ *The option to repurchase was an assignable right.* The Abrahams urge this Court to find that the 1952 option to repurchase was personal to Mike and Roseline and not assignable. They argue that Texas law must be used to interpret the contract because the parties agreed that Texas law would control. Citing *Prochemco, Inc. v. Clajon Gas Co.,* 555 S.W.2d 189 (Tex.Ct.App. 1977), *writ ref'd n.r.e.,* the Abrahams claim that in Texas, options to repurchase are personal covenants that cannot be transferred. *Prochemco,* however, does not support that proposition and is not applicable to the facts

of this case. In *Prochemco,* the agreement provided that the terms of a contract were covenants running with the land, and the agreement had no provision granting successors or assigns the right to exercise the option to extend the contract. *Id.* at 190. The *Prochemco* court noted that parties *may* determine that an option will be personal and nonassignable, *see id.* at 191, but by no stretch of interpretation did the court hold that all option contracts are personal and nonassignable. In contrast, the Texas courts, *see, e.g., Hott v. Pearcy/Christon, Inc.,* 663 S.W.2d 851, 853–54 (Tex.Ct.App. 1983), *writ ref'd n.r.e.,* cite favorably to the *Contracts* Hornbook written by Calamari and Perillo, which suggests that once an offer to purchase has ripened into an option contract by the payment of money to secure the option, the rights created usually are assignable, unless the option calls for some sort of personal performance. · John D. Calamari & Joseph M. Perillo, *Contracts* § 18–32 (3d ed. 1987). Professor Ronald Benton Brown, in his Note on real estate purchase options states that

> [t]he rights of the optionee may be transferred and the obligations of the optionor may bind those to whom the optioned land has been transferred. The question of whether that has happened is primarily a question of the intent of the parties to the option.... Ordinarily, an optionee would be unlikely to bargain for a right which could be defeated by the sale to another and so the option should be presumed binding on the optionor's successors unless otherwise agreed.

Ronald B. Brown, *An Examination of Real Estate Purchase Options,* 12 Nova L.Rev. 147, 187–88 (1987). In the case at bar, the parties expressly provided that the GLA–59 agreement would "inure to the benefit of and be binding upon the said parties and their respective heirs, successors and assigns."

■ The Abrahams argue that if this Court finds that the option was assignable, it would violate the rule against perpetuities, and the Court should construe the contract so that a violation would not occur.[1] At common law, the rule was designed to prevent the vesting of a future interest in property at an indefinite date that could exceed a length of time established as a life in being at the time of the creation of the interest plus twenty-one years. *See Producers Oil Co. v. Gore,* 610 P.2d 772, 774 (Okla.1980); *Gartley v. Ricketts,* 107 N.M. 451, 453, 760 P.2d 143, 145 (1988). The rule was judicially designed to prevent remote vesting of contingent interests in real property. *Cambridge Co. v. East Slope Inv. Corp.,* 700 P.2d 537, 540 (Colo.1985) (en banc). Options to purchase leased premises within the term of the lease are exempt from the rule. *See id.; Gore,* 610 P.2d at 774 (holding that rule does not apply to conditional preemptive options in operating agreements under oil and gas leases because oil and gas production cannot last indefinitely and rights are always terminable); *cf. III Lounge, Inc. v. Gaines,* 217 Neb. 466, 348 N.W.2d 903, 907 (1984) (lease provision allowing exercise of option "at any time" would be construed to allow exercise at any time within the term of the lease).

■ The option to repurchase in the case at bar was conditioned upon an event that was likely to occur or fail to occur within a reasonable amount of time because of the nature and use of the reservoir. Under the operating agreement that formed the basis of GLA–59, El Paso was required to drill at least eighteen wells within five years and agreed to produce and market the gas under the terms of the agreement.

As the Abrahams stated in their brief, the Texas case of *Mattern v. Herzog,* 367 S.W.2d 312 (Tex.1963), gives us guidance on the Texas application of the rule against perpetuities: "When the wording of the option does not compel a construction that the parties intended that the time element should be unlimited, the court will not construe an option contract ... to run for an indefinite time and thus destroy the validity of the option provision." *Id.* at 319. Because we can infer

---

1. Under the statute in effect at the time of trial, New Mexico took a "wait and see" and "cy pres" approach to determining if future interests were invalid. *See* NMSA 1978, § 47–1–17.1 (Repl. Pamp.1991) (repealed and recodified at NMSA 1978, § 45–2–901 (Repl.Pamp.1993)); *Gartley v. Ricketts,* 107 N.M. 451, 453, 760 P.2d 143, 145 (1988).

a reasonable time limitation in the agreement, and because the condition precedent from which the option arose did occur within twenty-one years of the death of a life in being at the creation of the option, no violation of the rule occurred under Texas or New Mexico law. We affirm the district court's conclusion and hold that the option to repurchase in the GLA–59 agreement was an assignable right, not personal to Mike and Roseline Abraham.

■ *The doctrine of presumed grant.* The Abrahams claim that New Mexico does not recognize the doctrine of presumed grant, and that even if we do recognize it, the theory should not be applied in this case because it was never pled, tried, nor reasonably contemplated by the Abrahams during the trial.

The doctrine of presumed grant is a rule of property law that crystallizes from a rebuttable presumption. *See* 3 Am.Jur.2d *Adverse Possession* § 5 (1986). For many years it has received recognition in the United States as an appropriate means to quiet long possession and it is based upon concepts of both logic and policy. It is logical because the inference of a lost or neglected grant is a natural one to be drawn from the facts; it serves the policy of protecting those who have maintained long possession of property with acquiescence from the record owner. *Fletcher v. Fuller,* 120 U.S. 534, 7 S.Ct. 667, 30 L.Ed. 759 (1887), appears to be the seminal case applying the doctrine. There, the Fletchers, whose family had been in possession of land for almost 100 years, could not produce a deed conveying title to the Fletchers' vendor, who was the grandson of the original owner. The devisees of the original owner claimed title under the owner's will, which had been probated some twelve years before the transfer to the Fletchers' predecessor. In the trial on the merits, the Fletchers asked for a jury instruction as to the presumption the jury might make of a lost grant to their ancestor in title. The instruction the court refused to give stated, in part,

"if you find that you can presume a grant, if you find from the testimony that there was a lost deed ... so that Jeremiah had a good title to convey to Stephen Jencks, that makes the title of the defendants here complete.... [T]he presumption ... was not necessarily restricted to what may fairly be supposed to have occurred, but rather to what may have occurred and seems requisite to quiet title in the possessor."

*Id.* at 544–45, 7 S.Ct. at 673.

In finding that the trial court erred in refusing to give the charge, the Supreme Court stated:

It may be, in point of fact, that permission to occupy and use was given ... upon a contract of sale, with promise of a future conveyance, which parties have subsequently neglected to obtain....

\*   \*   \*   \*   \*   \*

The law ... by reasonable presumptions ... affords the necessary protection against possible failure to obtain or to preserve the proper muniments of title....

\*   \*   \*   \*   \*   \*

It is not necessary, therefore, ... for the jury, in order to presume a conveyance, to believe that a conveyance was in point of fact executed. It is sufficient if the evidence leads to the conclusion that the conveyance might have been executed and that its existence would be a solution of the difficulties arising from its non-execution.

*Id.* at 545–47, 7 S.Ct. at 674.

The *Fletcher* court added that

presumption of a deed is one that may be rebutted by proof of facts inconsistent with its supposed existence, yet where no such facts are shown, and the things done, and the things omitted, with regard to the property in controversy, by the respective parties, for long periods of time after the execution of the supposed conveyance, can be explained satisfactorily only upon the hypothesis of its existence, then the jury may be instructed that it is their duty to presume such a conveyance, and thus quiet the possession.

*Id.* at 550, 7 S.Ct. at 676. As in *Fletcher,* there is proof in this case that the former owner actually agreed to sell and did sell the property in question and then acquiesced in

the buyer's rights and interests in the property. Under New Mexico Rule of Evidence 301 the resulting logical presumption of a lost or neglected grant is not mandatory, *see Mortgage Inv. Co. v. Griego,* 108 N.M. 240, 243–44, 771 P.2d 173, 176–77 (1989), but as in *Fletcher,* under a rule of property law the presumption of a grant arguably is mandatory as a matter of public policy if unrebutted. *Cf. Hester v. Sawyers,* 41 N.M. 497, 504, 71 P.2d 646, 650 (1937) (holding that once party has proven statutory time period of adverse possession, presumption of grant is conclusive); *Baker v. Certain Lands,* 19 Ark.App. 253, 720 S.W.2d 318, 320–21 (1986) (holding that when one in possession has paid taxes on lands previously forfeited to the state, redemption by grant is presumed as a matter of law).

■ Texas courts require evidence of three elements in order for the presumption of grant to arise: "long-asserted and open claim, adverse to the apparent owner, ... non-claim by the apparent owner, ... [and] acquiescence by the apparent owner in the adverse claim." *Magee v. Paul,* 110 Tex. 470, 221 S.W. 254, 256 (1920); *see also Bodin v. Gulf Oil Corp.,* 707 F.Supp. 875, 884 (E.D.Tex.1988) (holding that the doctrine of presumed grant "is designed to quiet title where there is (1) a long period of occupancy and dominion of the land by one party, that is (2) inconsistent with the record ownership vested in another party during which time (3) the legal owner did not attempt to exercise any rights"); *cf. United States v. Fullard–Leo,* 331 U.S. 256, 273, 67 S.Ct. 1287, 1295, 91 L.Ed. 1474 (1947) (requiring, for the doctrine of lost grant to be applicable, possession under a claim of right, actual, open and exclusive, and stating that chain of conveyances and payment of taxes is important). It is the acquiescence in the possession and assertion of ownership that affords the basis for finding that the title passed to the possessor by deed or otherwise. *M.T. Humphries v. Texas Gulf Sulphur Co.,* 393 F.2d 69, 72 (5th Cir.1968) (applying Texas law). Although there is dicta in *Clark v. Amoco Prod. Co.,* 794 F.2d 967 (5th Cir.1986), that in Texas a presumed lost deed must be pled and proved by the party asserting it, *see id.* at 971, a reading of the case on which that dicta was based (*Harvey v. Humphreys,* 178 S.W.2d 733 (Tex.Civ.App.1944), *writ ref'd n.r.e.*) does not lead this Court to that same conclusion. It is not necessary to plead specifically the existence of logical inferences in order to apply the resulting rule of law that determines a property interest. The trial court raised the possibility of applying the presumption during the trial, and we hold that the trial court had discretion to do so.

Relying on *Fiest v. Steere,* 175 Kan. 1, 259 P.2d 140 (1953), the Abrahams urge that the doctrines of adverse possession and prescriptive right have replaced the need for presumed grant, but we are not convinced of that proposition.

> The doctrine ... that the long[-]continued possession of land by one claiming as owner gives rise to the presumption of a valid conveyance to him or to the person under whom he claims, though ordinarily similar in its practical results to the statutes of limitation [for adverse possession], is entirely independent thereof. It involves a presumption of the rightfulness of one's possession, while the statutes of limitation are by their terms applicable only when the possession is, apart from such statutes, wrongful.

4 Herbert T. Tiffany, *The Law of Real Property* § 1136, at 700 (3d ed. 1975) (footnotes omitted). In New Mexico, adverse possession requires color of title supported by a writing or conveyance of some kind and payment of taxes during the period of possession, *see* NMSA 1978, § 37–1–22 (Repl. Pamp.1990); *Currier v. Gonzales,* 78 N.M. 541, 434 P.2d 66 (1967); *Platt v. Martinez,* 90 N.M. 323, 324, 563 P.2d 586, 587 (1977), neither of which are required to find presumption of a grant. "Where adverse possession can be shown, the doctrine of presumption of grant has no application." *Board of Trustees v. Rye,* 521 So.2d 900, 906 (Miss.1988).

■ Therefore, a presumption of grant may be found from evidence supporting the inference (a logical presumption) of a lost or neglected grant followed by long-term, open, active, exclusive possession of property under claim of right and acquiescence or no resis-

tance by interested parties to that possession or claim of right. Here, based on the written and signed agreements to transfer the leases, the complete performance of one of the parties,[2] and the statement by Mike Abraham that the interests had been conveyed, the trial court found that the grant should have been made if it in fact had not been made. We affirm the trial court's decision on ownership.

*El Paso's appeal of the trial court's reduction of the civil contempt award.—Summary of proceedings below.* El Paso filed its complaint for declaratory judgment in New Mexico on November 22, 1989. On June 1, 1990, Steve Abraham as personal representative of the Abraham estate (represented by Hartnett) filed suit against El Paso in the Probate Court of Harris County, Texas over the same subject matter. El Paso then filed in New Mexico a motion to enjoin prosecution in Texas, and on November 27, 1990 an injunction was entered enjoining further prosecution of the Texas action. Hartnett advised Steve Abraham to remove himself as personal representative and to procure the appointment of another personal representative. Hartnett then prepared a first amended complaint in the Texas action and applied to the Texas probate court for permission to file it. El Paso filed a motion in New Mexico for an order to show cause, seeking to hold Hartnett in contempt for violation of the injunction. The district court, in its findings and conclusions, established that Hartnett's actions violated the injunction; that, as a direct result of Hartnett's violation of the injunction, El Paso was required to hire counsel to appear in the Texas probate court; and that El Paso had incurred $24,000 in legal fees and expenses that would not have been incurred but for Hartnett's conduct in violating the injunction. The court then ruled that a judgment would be entered in due course, concluding that Hartnett was in civil contempt of court and that El Paso should recover from Hartnett the sum of $24,000. Three months later, the court entered an amended judgment of civil contempt (even though a judgment containing his original

ruling was never entered) reducing the award to $300. The court decided that the reduced award was justified because Hartnett had done nothing directly or indirectly to advance prosecution of the Texas action after the court had originally announced its decision.

*—Claims of error.* El Paso contends that once it established its entitlement to compensation, the district court's discretion to fashion an appropriate award to address Hartnett's contempt was limited to awarding El Paso full compensation for expenses incurred as a result of the contempt. El Paso cites numerous cases for its position. Hartnett's answer to the claim of error is that El Paso's appeal is frivolous because a trial court always has the power to change its interim findings until it loses jurisdiction of the case.

■ *—Purpose of civil contempt penalties.* Courts have both statutory and inherent authority to punish for contempt. NMSA 1978, § 34–1–2 (Repl.Pamp.1990); *State v. Clark*, 56 N.M. 123, 125, 241 P.2d 328, 329 (1952) (stating that the contempt statute is "only declaratory of the common law"). This Court discussed at length the difference between civil and criminal contempt in *Jencks v. Goforth*, 57 N.M. 627, 261 P.2d 655 (1953). We quoted to *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911), for the proposition that "[i]f it is for civil contempt the punishment is remedial, and for the benefit of the complainant." *Jencks*, 57 N.M. at 633, 261 P.2d at 659. We expanded the discussion of contempt further in *State ex rel. Apodaca v. Our Chapel of Memories of N.M., Inc.*, 74 N.M. 201, 392 P.2d 347 (1964). In that case, we stated:

> Judicial sanctions may ... be employed in civil contempt for either or both of two purposes: to coerce the defendant into compliance with the court's order and to compensate the complainant for losses sustained.

\* \* \* \* \* \*

alleged performance of the agreement.

---

**2.** Chemical Bank refinanced and took a mortgage on Rincon based on the agreement and

Where the purpose is to make the defendant comply, the court's discretion is exercised in considering the character and degree of the harm threatened by the continued contumacy and whether or not the contemplated sanctions will bring about a compliance with the court's order.

*Id.* at 204–05, 392 P.2d at 349–50.

In *In re Klecan,* 93 N.M. 637, 603 P.2d 1094 (1979), we further distinguished between civil and criminal contempt actions. We stated "[c]ivil contempts are those proceedings instituted *to preserve and enforce the rights of private parties to suits* and to compel obedience to the orders, writs, mandates and decrees of the court; whereas criminal contempt proceedings are instituted to preserve the authority and vindicate the dignity of the court." *Id.* at 638, 603 P.2d at 1095 (emphasis added). Clearly, the case before us now is one of civil contempt.

This Court has never passed on the question of whether a court has discretion not to award damages for actual losses once it has found that a violation of an injunction has occurred which resulted in actual damages in an ascertained amount. Other courts have. In *Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir.1979), the Second Circuit held that in an order of civil contempt a district court was not free to withhold damages to the extent they are proven. *See also W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 665 n. 5 (2d Cir.1970) ("The plaintiff in a civil contempt case may recover not less than the expenses, including counsel fees, which it has incurred in enforcing the disobeyed order of the court."). The Seventh Circuit sheds further light on the question of discretion:

The type of proceeding ... determines the degree of discretion which the district court may properly exercise over the course of the proceedings.... Since the rights of the complainant, not the authority of the court, are at stake in a civil contempt proceeding, the discretion of the court over the proceeding is more limited.... If Ms. Thompson was able to establish that the defendant violated the court's order, the court would have broad discretion in fashioning an equitable reme-

dy to ensure future compliance, but the award of compensatory damages for past violations would not be subject to the discretion of the court.

*Thompson v. Cleland,* 782 F.2d 719, 721–22 (7th Cir.1986).

The First Circuit also holds that a court has no discretion in this type of proceeding. In *Parker v. United States,* 153 F.2d 66, 70 (1st Cir.1946), the court first analogized the imposition of a compensatory fine in civil contempt to a tort judgment for damages caused by wrongful conduct. The sanction in that case was employed to make reparation to the injured party and to restore him to the position he would have held had the injunction been obeyed. The *Parker* court held that the district court was not free to exercise discretion and withhold an order for damages, once established. *Id.; see also In re Grand Jury Subpoena of June 12, 1986,* 690 F.Supp. 1451, 1453 (D.Md.1988) ("Once the complainant demonstrates actual losses stemming from the contumacious behaviour, the Court is not free to exercise its discretion and withhold an order awarding compensatory damages.").

Courts in the Sixth and Eighth Circuits have stated that a complainant is entitled to enforcement of court orders vindicating private rights. *See L.E. Waterman Co. v. Standard Drug Co.,* 202 F. 167, 172 (6th Cir.1913); *Enoch Morgan's Sons Co. v. Gibson,* 122 F. 420, 423 (8th Cir.1903). These holdings all are in accordance with the principles of tort law—once a duty has been established (to abide by the injunction, in this case) and the defendant violates that duty (by violating the injunction), if the plaintiff proves proximate cause of the damages (the necessity of hiring counsel to defend the lawsuit brought in violation of the injunction) and proves the amount of the damages (found to be $24,000 in this case), then the plaintiff has the right to recover those damages. We hold that once a plaintiff satisfies his burden of proving violation of a court order, proximate cause, and damages, he or she is entitled to judgment for recovery of those damages. Of course, if the damages were in the form of attorney's fees in defending against the violation, as in this case, the

court has discretion in determining the reasonableness of those fees. The court additionally may award attorney's fees incurred in obtaining the order of contempt. We find that the trial court erred in failing to enter a judgment for the amount of the damages proved.

■ There is another reason why the judgment of the trial court must be reversed. The court entered a judgment that was not supported by the findings of fact. Defendant Hartnett did not challenge the court's findings on appeal, and those findings shall now remain undisturbed. "[A] judgment cannot be sustained on appeal unless the conclusion upon which it rests finds support in one or more findings of fact." *Thompson v. H.B. Zachry Co.,* 75 N.M. 715, 716, 410 P.2d 740, 742 (1966). The trial court entered judgment for only $300 after it found that El Paso's compensable damages were in the amount of $24,000. In cases tried by the court, the findings of fact by the court have the same force and effect as the verdict of a jury. *Grayson v. Lynch,* 163 U.S. 468, 472, 16 S.Ct. 1064, 1066, 41 L.Ed. 230 (1896) (appeal from the Supreme Court of New Mexico). In effect, the court entered judgment notwithstanding *its own verdict,* and it did that without even a motion or challenge by the defendant.

■ The rules of civil procedure (SCRA 1986, 1–052 (Repl.Pamp.1992)) require the trial judge to make and file his decision " 'consisting of findings of such ultimate facts and conclusions of law stated separately *as are necessary to support his judgment,* in a single document; and that he sign and file such decision in the cause as a part of the record proper.' " *Lusk v. First Nat'l Bank,* 46 N.M. 445, 449, 130 P.2d 1032, 1034 (1942) (emphasis added) (emphasis in original deleted) (quoting *McDaniel v. Vaughn,* 42 N.M. 422, 423, 80 P.2d 417, 417 (1938)). The court could have filed an amended decision before entry of judgment, *see* SCRA 1986, 1–052(B)(1)(g), but it did not do so. Under the rule, "findings or conclusions not embraced in the single document ..., even though appearing elsewhere in the record, will be disregarded...." *Id.* The court justified the reduction of the award in its judgment by stating that it reduced the award granted in the decision because Hartnett "has done nothing directly or indirectly to advance prosecution of the Harris County Action" since the original violation of the injunction. The court then noted that the primary purpose of its issuance of the order to show cause was to coerce compliance with the injunction. However, nothing in the court's decision states that purpose, and the damages awarded in the decision were compensatory and not punitive damages.

Therefore, we affirm the decision of the trial court in regard to the declaratory judgment, and reverse and remand the judgment for contempt for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

BACA and FROST, JJ., concur.

FRANCHINI, J., dissents.

MONTGOMERY, J., not participating.

FRANCHINI, Justice (dissenting).

It is my opinion that Roseline Abraham never assigned, conveyed or divested herself in any manner of the option to repurchase; and that PWG never contracted or bargained for the option.

### Assignment

Although it is not affirmatively stated, I conclude that the majority agrees that Texas law applies to the subject case. I view *Prochemco* in a different light than either the majority or the appellant. It seems to me that Prochemco, Inc. had a real property interest as the landowner (through its wholly-owned subsidiary) and a personal property interest as the holder of an option to extend the contract. Whether or not Prochemco's option was assignable was the controlling factor in that dichotomy. Subsequently, the wholly-owned subsidiary conveyed a 99% interest in the land to a third party. Prochemco then quitclaimed to the third party all of its right, title, and interest in the land. *Prochemco, Inc. v. Clajon Gas Co.,* 555 S.W.2d 189 (Tex.Civ.App.1971), *writ ref'd n.r.e.* The third party asserted that since the interests

were conveyed, Prochemco no longer had an option that could be exercised under the theory that the option had run with the land.

The difference between the two cases is that the option in *Prochemco* was for the benefit of the land and thus was held to run with the land. The option in the instant case was for the direct benefit of the Abrahams and therefore a personal covenant. If, in fact, the Texas Court had considered the option to be conveyed along with any right title and interest that Prochemco had in the real property, then the quitclaim deed would have conveyed any rights under the option as well. The Court, however, found that it did not and that the option had survived that conveyance. The majority bases its opinion upon the assignment of the option to repurchase by the Abrahams in the transfer agreement of May 29, 1963. The general rule in Texas law is that personal property does not pass in the assignment of an oil and gas lease unless it is *expressly* passed. *OTC Petroleum Corp. v. Brock Exploration Corp.*, 835 S.W.2d 792 (Tex.Civ.App.1992) (citing *Phillips Petroleum Co. v. Adams*, 513 F.2d 355, 363 (5th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 281, 46 L.Ed.2d 259 (1975)). In that agreement there is no specific conveyance of personal property or the option. From these facts, I conclude that unless expressly enumerated, a conveyance of real property (fee simple or lease) does not include options that a person may possess that are personal and do not run with the land.

The majority then extensively analyzes the conduct of Mike Abraham as to his interest in the repurchase option. I consider this to be immaterial. The party in interest in this suit is the Estate of Roseline Abraham. Roseline was not a party to the 1964 bankruptcy plan proposed by Mike Abraham. Whatever representations made by Mike Abraham within that plan are not binding upon Roseline. At no time from 1951 through her death did Roseline expressly convey her interest in the option nor did she represent to any party that she had conveyed such an interest. The reasoning of the majority stretches to impute the conduct and intentions of all the other parties, without express or implied authority, to Roseline.

There is no theory of law in Texas or New Mexico that I am aware of that would allow that result.

### Intent

Texas law emphasizes, as a threshold analysis, the ambiguity of an assignment or conveyance. *OTC Petroleum Corp.*, 835 S.W.2d at 794. "To ascertain the objective intention of the parties, the courts examine and consider the entire writing, seeking to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (citing *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154 (1951)). Nowhere in the transfer is there an express conveyance of the option to PWG or is there any indication that PWG bargained for that conveyance. I, therefore, conclude that there was no objective intention to convey the option.

### Presumed Grant

The majority refers in two instances to the "possession" of the option by PWG. That is an interesting concept. Perhaps if the Abraham's had assigned their interests in their original mineral lease agreement then there would have been an argument that PWG possessed the option. That is not the case. In the benchmark case in New Mexico concerning presumed grant, Justice Brice references a property treatise on presumptive grant which states that "[t]his rule is based upon the assumption that if there had been no grant, the owner would have put an end to the wrongful occupation before the full period of limitation had expired." *Hester v. Sawyers*, 41 N.M. 497, 502, 71 P.2d 646, 651 (1937). An even more interesting question is how do you occupy an option. Roseline had no notice that PWG believed themselves to be the owner of the option. Upon notice that the conditions of the option had been met, Roseline immediately exercised her option. What action could she have been expected to take before that time? And since the option had not been bargained for or expressly documented in any of the agreements, she could not have been expected to contest its ownership. It is significant that in applying such an extraordinary doctrine as presumed grant through prescriptive easement, Justice Brice required the prescription be "open, uninter-

rupted, peaceable, notorious, adverse, under claim of right, and continue for a period of ten years with the knowledge or imputed knowledge of the owner." *Id.* at 504, 71 P.2d at 653. The majority opinion does not demonstrate how the actions of PWG meet these requirements.

The Texas law cited by the majority is similar. It requires three elements in order for a presumption of grant to arise: (1) "long asserted and open claim, adverse to the apparent owner, ... (2) non-claim by the apparent owner, ... [and] (3) acquiescence by the apparent owner in the adverse claim." *Magee v. Paul,* 110 Tex. 470, 221 S.W. 254, 256 (1920) (quoting from the majority). I can find no evidence in the record which demonstrates that PWG openly asserted a claim for any period of time. The only evidence in the record demonstrates that Roseline claimed her interest in the option as soon as she became aware that she could claim it.

I see no reason to apply the doctrine of presumed grant. Without it, there is no assignment, conveyance or any divesting action by Roseline. She exercised her option in October of 1989 and had no reason to take any other action until that time. I would reverse and set aside the judgement of the District Court because to do otherwise gives PWG a valuable interest that they never contracted or bargained for. For all of the above reasons, I dissent.