# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: _June 18, 2015_____

**NOS. 31,941 & 28,294 (Consolidated)**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH & FAMILIES**
**DEPARTMENT,**

      Petitioner-Appellant,

**Concerning JANET MERCER-SMITH and**
**JAMES MERCER-SMITH,**

      Respondents-Appellees.

**APPEAL FROM THE DISTRICT COURT OF LOS ALAMOS COUNTY**
**Barbara J. Vigil, District Judge**

Walz & Associates, P.C.
Jerry A. Walz
Albuquerque, NM

Narvaez Law Firm, P.A.
Henry F. Narvaez
Bryan C. Garcia
Albuquerque, NM

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Denise M. Chanez
Albuquerque, NM

for Appellant

Comeau, Maldegen, Templeman & Indall, LLP
Larry D. Maldegen
William P. Templeman
Stephen J. Lauer
Santa Fe, NM

Dan Cron Law Firm, P.C.
Dan Cron
Santa Fe, NM

for Appellees

**OPINION**

**BUSTAMANTE, Judge.**

{1}     In this case we assess what may be the outer edges of a court's exercise of its contempt power. At the Respondent parents' (James and Janet Mercer-Smith) urging the district court found the Children, Youth and Families Department (CYFD) in contempt of court for contravening the district court's order concerning foster placement of two of their children in its custody. The Mercer-Smiths then sought, and the district court granted, damages for loss of enjoyment of life because the possibility for reconciliation with their children had been reduced as a result of CYFD's contemptuous conduct. It awarded the Mercer-Smiths over $1.6 million in damages for loss of enjoyment of life and over $2 million in attorney fees and costs for prosecution of the contempt action. We affirm.

## I.     BACKGROUND

{2}     The case began in 2001 and evolved to encompass four distinct phases—abuse and neglect, foster placement, contempt, and contempt damages—that we summarize in turn. More details are provided as necessary to our discussion of CYFD's arguments on appeal.

## A. Abuse and Neglect Petition

{3}    In February 2001 the Mercer-Smiths' three daughters, Julia, Rachel, and Allison, were removed from their home based on allegations by Julia and Rachel that they had been abused by their parents. CYFD took custody of the three girls and filed an abuse/neglect petition against the Mercer-Smiths. In August 2001 the Mercer-Smiths and CYFD entered into a stipulated disposition whereby the Mercer-Smiths stipulated that "James Mercer-Smith will enter a plea of no contest to the following allegations: . . . James Mercer-Smith touched his children Julia and Rachel in a way that made them feel uncomfortable and which they reasonably perceived as sexual." They also stipulated that "Janet Mercer-Smith will enter a plea of no contest to the following allegations: . . . Janet Mercer-Smith knew or should have known that her husband . . . touched their children Julia and Rachel in a way that made them feel uncomfortable and which they reasonably perceived as sexual." In return, CYFD agreed to "recommend to the District Attorney that the treatment plan established through the Children's Court case is the most effective way to address the problems that exist with this family rather than through a criminal prosecution."

{4}    The Mercer-Smiths' pleas were accepted by the district court, which ordered that custody of the three girls would remain with CYFD and ordered compliance with a treatment plan. The goal of the treatment plan was reunification of the girls with

2

their parents. The abuse and neglect proceedings were effectively concluded by entry of the Mercer-Smiths' pleas; neither termination of parental rights nor criminal proceedings were ever initiated against the Mercer-Smiths. Several months later, Allison was returned to the Mercer-Smiths' custody.

{5}    In August 2002 the district court adopted a planned permanent living arrangement for Julia and Rachel. After this shift, reunification of Julia and Rachel with their parents was no longer a goal. While in CYFD's custody, Julia and Rachel lived for approximately eighteen and twenty-eight months, respectively, at Casa Mesita, a treatment group home.

**B.     Placement Hearing and Order**

{6}    In June 2003 CYFD proposed to remove Julia and Rachel from the group home and place Julia with the Schmierer family and Rachel with the Farley family. The Mercer-Smiths objected to this plan on the ground that Jennifer Schmierer and Gay Farley, both of whom had been employees at Casa Mesita, had a conflict of interest (or "dual relationship") based on their therapeutic relationships with Julia and Rachel at the group home. The Mercer-Smiths were also concerned that living with the Schmierers and Farleys would reduce the possibility of reconciliation with their daughters.

{7}     After several days of hearings, the district court found that the proposed placements would constitute "dual relationship[s]" and "potentially exploitive relationship[s]." It concluded that "[CYFD's] proposed placement of [the girls] into the home of Jennifer and Eric Schmierer [or Dwayne and Gay Farley] constitutes an abuse of discretion." The district court's order to this effect (the Placement Order) was entered on November 3, 2003.

{8}     Following the placement hearing, Rachel and Julia lived for approximately three-and-one-half months with Martin and Jeanne Ritter. After that period, CYFD changed the girls' living arrangement to "[s]emi [i]ndependent [l]iving." While living under this arrangement, the girls rented a room from Melissa Brown, Gay and Dwayne Farley's daughter, who lived a few houses from the Farleys.

## C.     Contempt Proceedings

{9}     Approximately eight months later, the Mercer-Smiths moved to hold CYFD in contempt for violating the Placement Order.[1] The parties engaged in discovery and a contempt hearing began in November 2006. The Mercer-Smiths did not present any

---

[1]In addition to CYFD, the motion named CYFD employees Rebecca Liggett, Lou Hoeppner, and Carmela Alcon, as well as Jennifer Schmierer, Gay Farley, Guardian ad litem Jane Wells Starke, and Julia and Rachel's counsel, Rachel Kolman. The allegations against the CYFD employees in their individual capacity, Jennifer Schmierer, Gay Farley, Jane Wells Starke, and Rachel Kolman were later dismissed.

witnesses, relying instead on their exhibits and CYFD's responses to requests for admissions, as well as requested admissions that were deemed admitted by the district court. CYFD called two witnesses, Rebecca Liggett, CYFD counsel for the Mercer-Smiths' case, and Carmela Alcon, the county office manager for Protective Services, a CYFD division. The district court entered extensive findings of fact and concluded that "CYFD, as an agency, engaged in activity and took direct actions that were in contempt of the November 3, 2003, [district c]ourt's [f]indings of [f]act and [c]onclusions of [l]aw and [d]ecision on [p]lacement." It therefore held CYFD in contempt of court. The district court's findings are discussed in more detail below.

**D.      Contempt Damages**

{10}      A five-day bench trial on damages began in May 2011. The district court also heard additional evidence and argument on October 19, 2011. Sixteen witnesses testified. The Mercer-Smiths argued that they had suffered emotional distress and loss of enjoyment of life and requested compensatory damages for those losses as well as attorney fees and litigation costs incurred in pursuing enforcement of the Placement Order. CYFD made a number of motions to preclude or admit certain evidence and to limit damages, the denials of which are discussed in detail below. At the conclusion of the trial, the district court found that "James Mercer-Smith suffered injuries and other harms caused by CYFD's contemptuous conduct" and that such

injuries included past and future emotional distress, loss of enjoyment of life, and "psychological expenses," and awarded compensatory damages of $616,000. It found that Janet Mercer-Smith suffered the same injuries and awarded compensatory damages of $1 million. Finally, the district court awarded the Mercer-Smiths compensatory attorney fees and litigation costs of $2,034,922, plus applicable gross receipts tax. CYFD appealed.

**E.     General Law of Contempt**

{11}     In order to provide context for the analysis that follows, it is useful to provide an overview of the law of contempt, including generally recognized available remedies. "The district court has inherent power to sanction for contempt." *Purpura v. Purpura*, 1993-NMCA-001, ¶ 6, 115 N.M. 80, 847 P.2d 314; *see* N.M. Const. art. VI, § 13. The contempt power is necessary to allow courts to "to regulate their docket, promote judicial efficiency, and deter frivolous filings," and "[i]t has long been recognized that a court must be able to command the obedience of litigants and their attorneys if it is to perform its judicial functions." *State ex rel. N. M. State Highway & Transp. Dep't v. Baca*, 1995-NMSC-033, ¶ 11, 120 N.M. 1, 896 P.2d 1148 (internal quotation marks and citation omitted). Although this power is a broad one, our Supreme Court has cautioned that "a court should invoke its inherent powers sparingly and with circumspection." *Id.* ¶ 25.

{12} "Contempts procedurally are either civil or criminal in nature [but] the line of demarcation between the two is somewhat hazy." *State ex rel. Bliss v. Greenwood*, 1957-NMSC-071, ¶ 6, 63 N.M. 156, 315 P.2d 223. Generally, the type of contempt at issue depends on the purpose behind the contempt determination. "Where the primary purpose is to preserve the court's authority and to punish for disobedience of its orders, the contempt is criminal. Where the primary purpose is to provide a remedy for an injured suitor and to coerce compliance with an order, the contempt is civil." *Id.*; *see Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911) ("It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases."). Here, the district court awarded damages to compensate the Mercer-Smiths for damage done to their chances of reconciliation with their daughters. These compensatory damages fall within the scope of civil contempt.

{13} Compensatory damages for civil contempt are "somewhat analogous to a tort judgment for damages caused by wrongful conduct." *Parker v. United States*, 153 F.2d 66, 70 (1st Cir. 1946), *cited in El Paso Prod. Co. v. PWG P'ship*, 1993-NMSC-075, ¶ 30, 116 N.M. 583, 866 P.2d 311. As such, they serve "to make reparation to the injured party and restore the parties to the position they would have held had the [court's order] been obeyed." *Vuitton et Fils S. A. v. Carousel Handbags*, 592 F.2d

7

126, 130 (2d Cir. 1979); *Hutto v. Finney*, 437 U.S. 678, 691 (1978) ("Civil contempt may also be punished by a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance."). Damages may include typical tort damages, including lost wages, *Meade v. Levett*, 671 N.E.2d 1172, 1181 (Ind. Ct. App. 1996); lost profits, *Eldim, Inc. v. Mullen*, 710 N.E.2d 1054, 1058 (Mass. App. Ct. 1999); emotional distress, *In re Reno*, 299 B.R. 823, 829 (Bankr. N.D. Tex. 2003); *Sebastian v. Texas Dep't of Corr.*, 558 F. Supp. 507, 510 (S.D. Tex. 1983); and attorney fees and litigation costs. *Baca*, 1995-NMSC-033, ¶ 25 (holding that a district court may award attorney fees against the state); *Spear v. McDermott*, 1996-NMCA-048, ¶ 43, 121 N.M. 609, 916 P.2d 228. *But see McBride v. Coleman*, 955 F.2d 571, 577 (8th Cir. 1992) ("[C]ivil contempt [is not] an appropriate vehicle for awarding damages for emotional distress[.]"). The district court does not have discretion to deny compensatory damages, if established with reasonable certainty. *El Paso Prod. Co.*, 1993-NMSC-075, ¶ 31 ("[O]nce a plaintiff satisfies his burden of proving violation of a court order, proximate cause, and damages, he or she is entitled to judgment for recovery of those damages."). In apparent recognition of the weight of this authority, CYFD did not argue below and does not argue here that compensatory damages are not available as a remedy for contumacious conduct.

8

{14}  "The elements necessary for a finding of civil contempt are: (1) knowledge of the court's order, and (2) an ability to comply." *In re Hooker*, 1980-NMSC-109, ¶ 4, 94 N.M. 798, 617 P.2d 1313. Thus, the party need not have intent to disobey the district court's order. *Seven Rivers Farm, Inc. v. Reynolds*, 1973-NMSC-039, ¶ 16, 84 N.M. 789, 508 P.2d 1276 ("[I]ntent is not an essential element of contempt."). Because knowledge of the district court's order is a prerequisite to contempt, the district court's order must not be ambiguous. *See Greer v. Johnson,* 1971-NMSC-127, ¶ 10, 83 N.M. 334, 491 P.2d 1145 (upholding a finding of contempt where the court's order was not ambiguous); *State ex rel. Patton v. Marron*, 1917-NMSC-039, ¶ 50, 22 N.M. 632, 167 P. 9 (stating that "[t]he order or decree alleged to have been violated must be definite and certain, and a respondent will not be held in contempt for alleged violation of an order wanting in these essential respects" and that "[t]he charge of contempt cannot be established for failure to comply with uncertain or indefinite orders, judgments, or mandates." (internal quotation marks and citation omitted)). That being said, the parties subject to an order have an obligation to seek clarification from the district court if they do not understand the court's order. When parties instead "undert[ake] to make their own determination of what [a] decree mean[s, t]hey act[] at their peril." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949). Further, "[i]t does not lie in [the contemnors'] mouths to say that they have

an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined. Such a rule would give tremendous impetus to [a] program of experimentation with disobedience of the law." *Id.*

{15} "When reviewing a charge of civil contempt, the action of the trial court will not be disturbed absent an abuse of discretion." *State ex rel. Udall v. Wimberly*, 1994-NMCA-121, ¶ 15, 118 N.M. 627, 884 P.2d 518. Thus, we will reverse a contempt judgment where "the ruling is clearly against the logic and effect of the facts and circumstances of the case[, or] based on a misunderstanding of the law." *Chavez v. Lovelace Sandia Health Sys., Inc.*, 2008-NMCA-104, ¶ 25, 144 N.M. 578, 189 P.3d 711 (internal quotation marks and citation omitted). "Even when we review for an abuse of discretion, our review of the application of the law to the facts is conducted de novo." *Id.* (alteration, internal quotation marks, and citation omitted). When reviewing whether the district court's findings are supported by the evidence, we "view[] the evidence in the light most favorable to the trial court's decision, resolve[] all conflicts and indulge[] all permissible inferences to uphold the court's decision, and disregard[] all evidence and inferences to the contrary." *State v. Gonzales*, 2001-NMCA-025, ¶ 40, 130 N.M. 341, 24 P.3d 776, *overruled on other grounds by State v. Rudy B.*, 2009-NMCA-104, 147 N.M. 45, 216 P.3d 810. In doing so, we are mindful that, as in all civil cases, "[t]he burden of proof in [civil contempt

10

proceedings] . . . is . . . the preponderance of the evidence." *Greer*, 1971-NMSC-127, ¶ 9. In addition, "the credibility of the witnesses and the weight to be given the evidence is for the trier of the facts." *Id.*

**II.     DISCUSSION AND ANALYSIS**

{16}     CYFD makes eleven arguments on appeal that we have grouped into three major categories. First, it argues that the district court did not have jurisdiction to continue contempt proceedings after Julia and Rachel had been dismissed from the abuse and neglect proceedings because they had turned eighteen. Second, it argues that its conduct was not contemptuous. Third, it argues that, even if the district court correctly held it in contempt, the district court erred in awarding damages to the Mercer-Smiths. The third category of arguments includes CYFD's assertions that (1) CYFD's conduct did not cause any damage to the Mercer-Smiths because, under a law of the case theory, CYFD had no duty to support reconciliation of the family, (2) the district court's findings of fact on damages are not supported by the evidence, (3) the "unclean hands" doctrine prohibits compensatory damages for the Mercer-Smiths, (4) certain evidence was improperly admitted, (5) the New Mexico Tort Claims Act either precludes or limits the amount of damages that can be awarded, (6) the amount of attorney fees awarded was incorrect, and (7) the district court judge improperly refused to recuse herself from the case. We address these arguments in turn.

11

## A.  Jurisdiction

{17} CYFD first argues that the district court should have abated the contempt proceedings when Julia and Rachel turned eighteen and CYFD's legal custody of them was terminated by operation of law. *See* NMSA 1978, § 32A-4-24(F) (2009) ("When a child reaches eighteen years of age, all neglect and abuse orders affecting the child then in force automatically terminate except as provided in [NMSA 1978,] Section 32A-4-23.1 [(2009)] . . . and Subsection [C] of [NMSA 1978,] Section 32A-4-25.3 [(2009)])."

{18} We disagree that the district court lost jurisdiction to continue contempt proceedings when the abuse and neglect proceedings were terminated. In *Gonzales v. Surgidev Corp.*, the New Mexico Supreme Court considered whether the district court had jurisdiction to enter sanctions for discovery abuses after a final judgment had been entered in the underlying matter. 1995-NMSC-047, ¶ 9, 120 N.M. 151, 899 P.2d 594. It concluded that it did, stating that "[a] court retains jurisdiction under its inherent authority to impose sanctions at any time, subject only to constitutional limitations or equitable defenses." *Id. Gonzales* is dispositive of this issue.

{19} CYFD also argues that continuing with the contempt proceedings was contrary to law because those proceedings did not further the purposes of the Children's Code. *See* NMSA 1978, §§ 32A-1-1 to -24-5 (1993, as amended through 2013). CYFD

12

maintains that the imposition of the district court's contempt powers under the Children's Code necessarily requires that the court conduct children's court proceedings, and any contempt proceedings thereunder, "in a manner that will further the purposes and policies of [the Children's Code]." *State v. Julia S.*, 1986-NMCA-039, ¶ 19, 104 N.M. 222, 719 P.2d 449. For support, CYFD directs us to *Julia S.*, in which this Court considered whether the district court could order incarceration of a child as a sanction for a first probation violation under its contempt power. *Id.* ¶ 18. Stating that "the court is expected to conduct children's court proceedings in a manner that will further the purposes and policies of [the Children's Code]" and that "[t]his expectation extends to the imposition of the court's contempt powers[,]" the Court held that incarceration of the child for the first probation violation was contrary to the Children's Code because the Children's Code provided that the child may be incarcerated only after three probation violations. *Id.* ¶¶ 19, 21-22. The Court also held that the district court's inherent contempt power was not unreasonably hindered by the statutory limitation in the Children's Code. *Id.* ¶ 27.

{20}     *Julia S.* is inapposite for two reasons. First, the *Julia S.* court expressly limited its analysis and holding to "probation violations of [children in need of supervision]" and stated that it "express[ed] no opinion . . . as to the proper limits of the court's contempt power for an indirect contempt other than a probation violation." *Id.* ¶ 28.

13

Second, there the contempt sanction was reversed because it was in direct contradiction to a provision in the Children's Code. *Id.* ¶ 22. Here, there is no express provision in the Children's Code prohibiting the district court's award of compensatory contempt damages to the Mercer-Smiths.

{21} As to CYFD's more general argument that the finding of contempt and award of damages exceeded the district court's authority because they did not further "the care, protection[,] and wholesome mental and physical development" of Julia and Rachel or the preservation of the Mercer-Smith family, this argument misplaces the focus of the inquiry. *See* § 32A-1-3(A). CYFD would have us focus on whether the contempt order and damages award themselves further the purposes of the Code, but the more appropriate inquiry is whether the district court's Placement Order did so. So long as the Placement Order was consistent with the Children's Code, a contempt order enforcing that order is also consistent with it. *See* § 32A-4-13(B) (stating that the Children's Court has contempt power). We conclude that the district court had jurisdiction to enter the contempt order and award compensatory damages.

**B.    Contumacious Conduct**

{22} CYFD next argues that the district court erred in finding its conduct contumacious. It makes two contentions. The first hinges on the language of the Placement Order. CYFD contends that the Placement Order was not clear and

14

unambiguous because the language of the order prohibited only "placement" of the girls with the Schmierers and Farleys as licensed foster parents with a contract with CYFD to care for the girls. The second argument is that, even if the Placement Order was unambiguous, the district court's findings as to contempt are not supported by the evidence. We begin with the first argument.

{23} CYFD maintains that the Placement Order prohibited only "placement" of Julia and Rachel in the Schmierer and Farley homes and CYFD designation of those families as foster parents to Julia and Rachel. CYFD asserts that "placement into foster care is derived from a signed contract between CYFD and the prospective foster family and the payment of money by CYFD to that foster family." Thus, it argues that it did not disobey the Placement Order because there was never a contract with the Schmierers and Farleys and no foster parent payments were made to them. Further, it contends, it was not clear and unambiguous that the district court intended to prohibit contact between the girls and the Schmierer and Farley families.

{24} This argument elevates form over substance. Even if we accept CYFD's argument that the Placement Order did not prohibit contact between the girls and the two families, CYFD's position ignores the district court's findings to the effect that the *amount* of contact was tantamount to placement in those homes and thus violated the Placement Order.

15

{25} It is clear from the language in the Placement Order and from the district court's oral ruling that it was concerned about the nature of the relationship between the girls and people who had been their counselors. For instance, in the Placement Order the district court found that Julia was a former client of Jennifer Schmierer and that "Gay Farley . . . rendered counseling or therapy to Rachel . . . within the previous [sixty] months of the proposed placement." Based on these findings, it also found that the placement of Julia and Rachel with their former counselors created "dual relationships" that are forbidden by the code of ethics for counselors and therapists. 16.27.18.18(D) NMAC (06/15/2001). Section 16.27.18.16(B) NMAC (07/01/2004) of the code of ethics includes within "dual relationships" those involving a "financial or other potentially exploitive relationship with the client."[2] At the conclusion of the placement hearing, the district court stated that it was troubled by the proposed

---

[2]We note that the concept of a "dual relationship" appears in other parts of the Administrative Code relating to psychologists and social workers. For instance, with regard to social workers, 16.63.16.8(G)(3) NMAC (09/01/2014) prohibits social workers from engaging in dual relationships, which "occur when social workers relate to clients in more than one relationship, whether professional, social, or business. Dual or multiple relationships can occur simultaneously or consecutively." Similarly, "[a] psychologist shall not serve in varied capacities that confuse the role of the psychologist. Such confusion is most likely when the psychologist changes from one role to another and fails to make clear who is the client or patient. The psychologist is responsible for taking appropriate precautions to avoid harmful dual relationships[.]" 16.22.2.9(B)(4) NMAC (03/21/2009). 16.22.1.7(A)(16) NMAC (04/11/2012) states that a dual relationship constitutes a conflict of interest for psychologists.

16

placement plan "because of the risk of roles in these types of cases being confused." It also referenced the "prior relationship" between the girls and their counselors and the counselors' ethical obligations. Contrary to CYFD's argument, we think it is clear from these statements and the district court's findings that it was concerned about Jennifer Schmierer and Gay Farley assuming multiple roles in the girls' lives, not only about where the girls would live and who got paid by CYFD. Given, among other things, email exchanges among CYFD case workers and CYFD counsel discussed further below, we conclude that this intent and limitation inherent in the district court's order was understood by CYFD also.

{26} We next address CYFD's contention that the district court's findings are not supported by the evidence. CYFD argues that the district court erred in deeming admitted the Mercer-Smiths' second and third requests for admission (RFAs) and that, without these admissions, there is insufficient evidence to support the district court's findings related to contempt. It also specifically challenges fifty-five findings of fact. Any unchallenged findings are binding on appeal. Rule 12-213(A)(4) NMRA ("The argument shall set forth a specific attack on any finding, or such finding shall be deemed conclusive."). We begin with a discussion of how the second and third requests for admission came to be deemed admitted and review this ruling for an abuse of discretion.

{27} After the Mercer-Smiths served their second and third RFAs, CYFD moved for a protective order and to strike the requests or for additional time to respond to the requests. After a hearing, the motion for additional time was granted "pending further hearing in this matter." A hearing was held on June 13, 2006, but CYFD's attorney was not present. Following the Mercer-Smiths' argument in response to CYFD's motion for a protective order, the district court ordered the requested admissions deemed admitted. CYFD moved for reconsideration of this order.

{28} At the hearing on the motion for reconsideration, the district court heard from both CYFD and the Mercer-Smiths on whether appropriate notice of the June 13, 2006, hearing was given to CYFD. The Mercer-Smiths presented billing records and telephone call records documenting their efforts to schedule the June 13, 2006, hearing. CYFD argued that no one at CYFD had received notice of the hearing and that it had not been contacted by the Mercer-Smiths about the hearing. The district court confirmed the procedures for mailing hearing notices by its staff. Ultimately, the district court concluded that "the process and notification requirements [that] the court is obligated to fulfill in this case have been met and that [CYFD] failed to appear for the hearing." It therefore denied the motion for reconsideration and stated that "the court's ruling will stand." On appeal, the Mercer-Smiths maintain that notice was provided to CYFD and CYFD avers that it was not. We defer to the district

18

court's resolution of factual conflicts. *Buckingham v. Ryan*, 1998-NMCA-012, ¶ 10, 124 N.M. 498, 953 P.2d 33 ("[W]hen there is a conflict in the testimony, we defer to the trier of fact."). Given its determination that CYFD received notice but failed to appear, we conclude that the district court did not err in deeming the second and third requests for admission admitted. *Morrison v. Wyrsch*, 1979-NMSC-093, ¶¶ 13, 15, 93 N.M. 556, 603 P.2d 295 (stating that district courts have discretion to determine whether counsel's failure to respond to a request for admission is excusable and, if not, to deem the requests admitted); *see* Rule 1-036 NMRA.

{29}     After reviewing the admitted RFAs as well as other evidence, we conclude that the district court's findings are supported by substantial evidence. "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Miller v. Bank of Am., N.A.*, 2014-NMCA-053, ¶ 11, 326 P.3d 20 (internal quotation marks and citation omitted), *cert. granted*, 2014-NMCERT-005, 326 P.3d 1112. Under the substantial evidence standard of review,

> the question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached. We will not reweigh the evidence nor substitute our judgment for that of the factfinder. We consider the evidence in the light most favorable to the prevailing party and disregard any inferences and evidence to the contrary.

*Id.* (alterations, internal quotation marks, and citations omitted).

19

{30} In essence, the district court found that CYFD knew that the Placement Order prohibited the two families from being caretakers of Julia and Rachel and that it nevertheless arranged for Julia and Rachel to "spend[] the majority of their waking hours either in school or with the [Schmierers and Farleys]." We examine whether the evidence supports the district court's findings as to (1) the contact between the girls and the Schmierers and Farleys, (2) CYFD's knowledge of the nature and extent of the contact, (3) the extent of the Ritters' role and CYFD's knowledge of that role, and (4) whether CYFD intentionally took direct action contrary to the Placement Order.[3]

{31} CYFD challenges findings of fact to the effect that Julia and Rachel (1) ate morning and evening meals with the Schmierers and Farleys; (2) were transported to and from school, extracurricular activities, and medical appointments by the Schmierers and Farleys; (3) were taken on vacation by Gay Farley; and (4) were provided with their own bathrooms in the Schmierer and Farley homes. They also challenge findings that Rachel attended church with Gay Farley and received clothing, presents, school supplies, and a cell phone from Gay Farley, that Rachel kept clothing at the Farley home, and that Gay Farley paid for medical expenses for Rachel, which payment was later reimbursed by CYFD, and for dance lessons.

---

[3]Because we have concluded that the district court retained jurisdiction over the contempt proceedings, we do not need to address CYFD's challenge to the district court's finding that it had jurisdiction to continue them.

20

Similarly, they challenge findings that Jennifer Schmierer or the Schmierers paid for, and were reimbursed for, Julia's medical expenses and paid for her cell phone. Finally, they challenged the district court's findings that the Schmierers and Farleys were "caretakers" for the girls. Many of these findings were in fact admitted by CYFD in the first RFA. Others are supported by admissions from the RFAs that were deemed admitted by the district court. Furthermore, the district court's finding that "[during the time the Ritters were the putative foster parents], the Schmierers and the Farleys performed functions that a foster parent normally would" is unchallenged.

{32} CYFD also challenges findings related to whether CYFD knew of the type and degree of contact between Julia and Rachel and the Schmierers and Farleys. These include findings that "the only foster care services provided by the Ritters that [the CYFD social worker knew of] was 'a place to sleep[,]' " that "CYFD was aware that Gay Farley had daily contact with the Mercer-Smith girls while the Ritters were 'foster parents[,]' " and that "CYFD knew of the nature of the contact Gay Farley had with the Mercer-Smith girls while the Ritters were 'foster parents.' " Other findings were that one or both of the Schmierers and one or both of the Farleys had "attended most CYFD staffing meetings involving [Julia and Rachel] since September 9, 2003" and that "CYFD is aware that Gay Farley has taken the Mercer-Smith girls out of state." Again, some of these findings are supported by CYFD's admissions on the

21

first RFA. Identical statements in the third RFA that were deemed admitted also support these findings. Thus, they are supported by the evidence.

{33} The district court made findings to the effect that the "placement" of the girls with the Ritters was superficial and that the Ritters were not caretakers of Julia and Rachel to the same extent the Schmierers and Farleys were. For instance, the district court found that CYFD policy requires that foster parents be licensed and that, although the Ritters had been licensed as foster parents until August 2003, they were not licensed foster parents during the time that Julia and Rachel were "placed" with them. It also found that the Ritters did not attend CYFD meetings about Julia and Rachel and that CYFD did not visit the Ritter home while Julia and Rachel were "placed" there even though its policy is to conduct home visits monthly. It found that "[t]here are no . . . contact notes for the period of time Julia and Rachel . . . were 'placed' with the Ritters." These findings are either unchallenged, admitted by CYFD, or supported by the deemed admissions. Finally, CYFD does not challenge the district court's finding that the social worker noted in the case notes that "[i]n essence, we were asking the Ritters to provide a place for [Julia and Rachel] to sleep, with minimal oversight required." Together, these findings support the district court's further finding that the Ritters "were not [f]oster [p]arents for Julia and Rachel

22

Mercer-Smith between October 5, 2003[] and January 31, 2004[,]" and related findings.

{34} Finally, the findings as to CYFD's knowledge of the level of contact occurring between the girls and the two families and its facilitation of the Schmierers' and Farleys' (1) daily contact with the girls; (2) participation in meetings concerning the girls; (3) reimbursement for medical expenses; and (4) out-of-state vacations with the girls, among other things, support the district court's further finding that "CYFD, as an agency, engaged in activity and took direct actions that were in contempt of the [Placement Order]." As to the findings related to whether CYFD intended to contravene the Placement Order, the evidence supports these findings as well. CYFD challenges the district court's findings that "CYFD was only interested in placing Julia . . . with the Schmierers and Rachel . . . with the Farleys[,]" that "CYFD did not want to place [Julia and Rachel] with the Ritters[,]" that a CYFD social worker told the Ritters that she intended the girls to be with the Schmierers and Farleys "as much as possible" while "placed" with them, and that "[t]he designation by CYFD of the Ritters as 'foster parents' was done deliberately by CYFD for the purpose of concealing from the [c]ourt . . . that [the Schmierers and Farleys] served the function of being foster parents for [the girls]." Gay Farley testified that immediately after the placement hearing at which the district court prohibited placement of the girls with

the Schmierers and Farleys, she met with several CYFD personnel, including CYFD counsel, to develop a plan for the girls' living arrangements. On cross-examination, she agreed with the Mercer-Smiths' counsel that "[the] plan that was agreed to by the participants in that meeting was that the girls would sleep at the Ritters['] and spend the rest of their time with [the Farleys] and the Schmierers[.]" Consistent with this testimony, a CYFD social worker stated in her notes that she told the Ritters that the girls "would be spending the majority of their waking hours either in school or with [the Schmierers and Farleys]. In essence, [CYFD was] asking the Ritters to provide a place for them to sleep, with minimal oversight required" and that she "t[r]ied to assure the Ritters that [CYFD was] asking them to do minimal actual parenting." CYFD's case notes indicate that when CYFD decided to implement the semi-independent living plan, CYFD personnel were aware that Rachel's and Julia's residence with the Farley's daughter might violate the placement order. Indeed, the social worker noted that "[t]he judge may disagree with placement of the girls with the Browns [the Farleys' daughter's family] as foster care due to their relationship with the Farleys." In email exchanges discussing the semi-independent living plan and renting a room with the Browns, CYFD personnel acknowledged that this arrangement could constitute an "end run" around the Placement Order, stating, "If the question is do I think . . . [the district court] will accuse us of trying to back door

24

[it], yes I think that is possible. If the question is whether we should do it anyway, I think the answer is also yes[.]" CYFD personnel also questioned whether it had "an obligation to inform the court of the relationship [between the Browns] and the Farley[]s who were initially denied by the court[.]" In addition to this evidence, the findings related to CYFD's intent are supported by facts deemed admitted in the third RFA.

{36} We need not address the remainder of the challenged findings, as those already discussed are sufficient to support the district court's conclusion that CYFD acted in contempt of the Placement Order. We conclude that, viewed in the light most favorable to the district court's conclusion, the evidence supports the district court's findings and therefore find no error in its conclusion that CYFD was contumacious.

**C.    Damages**

{37} CYFD makes seven allegations of error in the district court's damages award. We address each argument in turn.

**1.    Law of the Case Theory**

{38} CYFD first argues that the damages award to the Mercer-Smiths was contrary to the law of the case. CYFD's law of the case argument goes as follows: because "CYFD had absolutely no legal duty or obligation to seek, encourage, or support any reconciliation between the girls and their parents[,]" it could not have breached that

25

duty and, therefore, there could not have been any damage to the Mercer-Smiths as a result of CYFD's conduct. For support, CYFD relies on the fact that the district court ruled in 2002 and 2003 that Julia and Rachel "[would] not return to their home of origin."

{39} CYFD conflates the concepts of reunification, meaning that Julia and Rachel would return to live in the Mercer-Smiths' home, and reconciliation, meaning contact and communication between the girls and their parents in the future. Although the permanency plan for Julia and Rachel was changed from reunification to a planned permanent living arrangement by agreement of the parties, and it was clear that Julia and Rachel would not return to their parents' home, it is also clear from the record that the district court, several witnesses at the placement hearing, and CYFD itself understood reunification and reconciliation to be two separate ideas. For instance, the district court indicated that reconciliation was still a goal when it ordered the girls to participate in therapy with Janet Mercer-Smith even after the planned permanent living arrangement was instituted. In addition, in questioning Dr. Charles Glass, a therapist hired by CYFD to work with the family, at the placement hearing, CYFD's counsel asked about CYFD's obligation to pursue reunification. Dr. Glass differentiated between reunification and reconciliation, stating that he understood that CYFD was not obligated to try to reunify the family. This distinction having been

made, CYFD went on to ask him about reconciliation in families separated because of abuse. On redirect, the Mercer-Smiths' counsel also distinguished between reunification and reconciliation and Dr. Glass testified as to the potential impact of reconciliation on children. Similarly, CYFD asked Jennifer Schmierer how she would react "if Julia indicated that she wanted to have contact with her parents" and she testified that she would "make sure it would happen." CYFD also asked whether Ms. Schmierer had any conversations with Julia about whether she should have contact with her parents. CYFD also questioned Rachel and Julia about whether they had spoken with Ms. Schmierer or Ms. Farley about having contact with their parents. Given that reunification with the Mercer-Smiths was not a goal at the time of the hearing, these questions indicate that CYFD and these witnesses understood that reconciliation between the Mercer-Smiths and the girls was different from reunification. Thus, it was not the "law of the case" that reconciliation was not a goal for Rachel and Julia.

**2.    Substantial Evidence**

{40}    CYFD next argues that "there was no credible evidence introduced at the placement hearing or the damages trial as to [the] viability of reconciliation between the girls and the [Mercer-Smiths] as of 2003." It specifically challenges two findings of fact in the district court's order on damages. After reviewing of the evidence in the

27

light most favorable to the district court's findings and disregarding evidence to the contrary, we conclude that these findings are supported by the record. *Miller*, 2014-NMCA-053, ¶ 11.

{41} In challenged finding number six, the district court found that "prior to the [district c]ourt's . . . 2003 . . . ruling on CYFD's proposed change in placements, there continued to be viable prospects for reconciliation between [the Mercer-Smiths] and their daughters." Dr. Glass was admitted as an expert in psychology at the placement hearing and also testified later at the damages hearing. At the damages hearing, Dr. Glass testified that as of late 2002, although "[t]here were certainly concerns about whether it was going to be possible or not, [he] believed that the potential was still there for reconciliation [between the Mercer-Smiths and their daughters]." Dr. Glass also signed a letter that was submitted to the district court before the placement hearing and later admitted at the damages hearing stating that he believed "that any possibility of future reconciliation with the girls' parents would be significantly lessened if they were to reside with [the Schmierers and the Farleys]." This statement implies that at the time of the letter there was a possibility of reconciliation between the girls and their parents. CYFD appears to argue that this evidence is insufficient because it is merely the authors' belief. But both Dr. Glass and Dr. Ned Siegel, who also signed the letter, were admitted as experts and experts are permitted to express

28

an opinion under Rules 11-702, 703, and 704 NMRA. We conclude that this evidence is sufficient to support the district court's finding number six that there were "viable prospects for reconciliation" before the 2003 Placement Order.

{42} Challenged finding number seven states that "[d]espite th[e] written statement [referenced above], CYFD, Julia and Rachel never asserted in responsive pleadings and testimony that prospects for reconciliation . . . had already been irretrievably damaged." Because the evidence cited in support of this finding includes only the pleadings in response to the Mercer-Smiths' objection to the placement of the girls and to the testimony at the placement hearing, we interpret this finding to be focused only on what CYFD asserted in those pleadings. On appeal, CYFD points to evidence that "Julia and Rachel had repeatedly told their therapists, the expert psychologists, CYFD, and the judge that they had no desire or intention to reunify or reconcile with their parents." It maintains that "[a]ll this evidence contradicts the [district c]ourt's [f]inding of [f]act [number seven]." But CYFD does not direct us to any instance *in the specific pleadings and testimony referenced in this finding* where CYFD or the girls stated that reconciliation was no longer viable. We conclude that this finding is supported by the evidence, although we note that the finding is also very limited in scope.

29

{43} CYFD argues in a few sentences that its conduct was not the cause of any decrease in the possibility of reconciliation and maintains that the district court's findings and conclusions to the contrary are "erroneous." It claims that "[t]hese findings and conclusion[s] are contradicted by Julia and Rachel." But under the substantial evidence standard of review, we do not consider evidence contrary to the district court's findings. *Miller*, 2014-NMCA-053, ¶ 11. In addition, CYFD does not explain how the district court's findings are incorrect. We therefore do not consider this argument any further. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076.

**3. Unclean Hands[4]**

{44} CYFD argues that the district court abused its discretion when it awarded damages to the Mercer-Smiths because "[t]he doctrine of unclean hands generally prevents a complainant from recovering where he or she has been guilty of fraudulent, illegal or inequitable conduct in the matter with relation to which he [or she] seeks relief." *Magnolia Mountain Ltd., P'ship v. Ski Rio Partners, Ltd.*, 2006-NMCA-027, ¶ 36, 139 N.M. 288, 131 P.3d 675 (alteration in original) (internal

---

[4]Although CYFD references estoppel in its brief in chief, it makes no substantive argument based on estoppel and expressly stated in the proceedings below that it withdrew its estoppel argument. We therefore do not address CYFD's argument based on estoppel.

30

quotation marks and citation omitted). CYFD argues that the damages award is improper because of the Mercer-Smiths' "reprehensible misconduct" that led to entry of the no-contest plea. The Mercer-Smiths argue that this argument is unavailing because "[i]n most other jurisdictions, the [unclean hands] doctrine is not a defense to a claim for damages." They cite to several out-of-state cases as support for this proposition. *See, e.g., Wilson v. Prentiss*, 140 P.3d 288, 293 (Colo. App. 2006) ("The doctrine of unclean hands enables a defendant to raise an equitable defense to defeat equitable remedies, but not remedies at law.").

{45} Several New Mexico domestic relations cases state that "in the context of contempt proceedings, the court has the power to consider any valid defense," including equitable defenses. *Hopkins v. Hopkins*, 1989-NMCA-101, ¶ 18, 109 N.M. 233, 784 P.2d 420; *Mask v. Mask*, 1980-NMSC-134, ¶ 5, 95 N.M. 229, 620 P.2d 883 (stating that because that "case arose in the context of a contempt proceeding[,] . . . equitable principles [were] applicable"). In *Corliss v. Corliss*, 1976-NMSC-023, ¶ 3, 89 N.M. 235, 549 P.2d 1070, the Court appeared to distinguish between contempt actions and those for money damages when it stated that the wife in that case brought a "contempt action as opposed to seeking a money judgment for arrearages. This action invoked the equitable powers of the court in which the trial court has discretion. In a suit for a money judgment very little discretion is allowed. The court

31

merely examines the validity of the prior judgment and enters a money judgment." *Id.* We have found no New Mexico case expressly addressing whether the unclean hands doctrine is a defense to contempt of court where compensatory money damages are sought.

{46}     In *El Paso Production Co. v. PWG Partnership*, however, the New Mexico Supreme Court held that district courts do not have discretion to withhold a damages award for contempt if the plaintiff has proven a violation, causation, and damages. 1993-NMSC-075, ¶ 31, 116 N.M. 583, 866 P.2d 311 ("We hold that once a plaintiff satisfies his burden of proving violation of a court order, proximate cause, and damages, he or she is entitled to judgment for recovery of those damages."). A lack of discretion in this decision suggests that the equitable defense of unclean hands is not available. But we need not resolve this issue because even if it is, the doctrine does not apply here. "Ordinarily, the wrong which may be invoked to defeat a suit under the clean-hands maxim must have an immediate and necessary relation to the equity which the complainant seeks to enforce against the defendant." *Romero v. Bank of the Sw.*, 2003-NMCA-124, ¶ 38, 135 N.M. 1, 83 P.3d 288 (alteration, internal quotation marks, and citation omitted). "What is material is not that plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts[.]" *Mechem v. City of Santa Fe*, 1981-NMSC-104, ¶ 10, 96 N.M. 668, 634 P.2d 690. For instance,

32

in *Romero*, this Court affirmed the denial of the unclean hands defense where the "unclean" conduct complained of was unrelated to the transaction for which the plaintiff sought restitution. 2003-NMCA-124, ¶ 38. Here, the Mercer-Smiths sought to have the district court's Placement Order enforced. The conduct of which CYFD complains did not occur during the placement or contempt proceedings and did not relate to the Mercer-Smiths' right to have the Placement Order followed. We conclude that the district court did not err in denying CYFD's assertion that the unclean hands doctrine precludes the contempt damages award.

**4.      Evidentiary Rulings**

{47}      CYFD argues that the district court erred in three evidentiary rulings. "We review the admission of evidence for abuse of discretion." *Couch v. Astec Indus., Inc.*, 2002-NMCA-084, ¶ 8, 132 N.M. 631, 53 P.3d 398. First, it maintains that the district court wrongly precluded admission of the stipulated judgment in which the Mercer-Smiths entered pleas of no contest. We discern no error in the district court's ruling because Rule 11-410(A)(2) NMRA prohibits the admission of a nolo contendere plea against the one who made it as proof of guilt. In an argument similar to its "unclean hands" argument, CYFD argues that it "would have utilized [the evidence of the nolo pleas] to show based on those admissions, that the Mercer-Smiths were not entitled to damages." Such use is clearly prohibited by Rule 11-410(A)(2). *See Kipnis v.*

33

*Jusbasche*, 2015-NMCA- __, ¶ 15, __ P.3d __ (No. 33,821, Apr. 2, 2015) (stating that the rule prohibits admission of evidence of nolo pleas when offered to prove guilt).

{48} Second, CYFD argues that the district court erred when it denied admission of the transcript of a safehouse interview with Julia. Despite CYFD's arguments that the transcript was admissible because it was either a "business record" under Rule 11-803(6) NMRA or a prior consistent statement under Rule 11-801(D)(1) NMRA, the district court ruled that the transcript was inadmissible hearsay. On appeal, CYFD argues only that the interview "was relevant and admissible as [a] prior consistent statement[]." It does not make a substantive argument as to why admission of a prior consistent statement was necessary or why the district court's ruling was incorrect. "We will not review unclear arguments, or guess at what [a party's] arguments might be." *Headley*, 2005-NMCA-045, ¶ 15.

{49} Third, CYFD argues that the district court erred in admitting and considering the testimony by economist Stan Smith and that "[his] entire testimony . . . should be stricken as it fails to meet the admissibility standards pursuant to *State v. Alberico* [, 1993-NMSC-047], 116 N.M. 156, 861 P.2d 192 . . . and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 . . . (1993)." It also argues that Smith's testimony was "not . . . sound as his opinions were based on self-reporting

34

impairment assessments . . . by the Mercer-Smith[s], as well [as] upon blatantly false assumptions that Julia and Rachel . . . would provide household services and guidance and counseling to [the Mercer-Smiths]." **[BIC 97]**

{50}    Generally, "it is not improper for the trial court to permit an economist to testify regarding his or her opinion concerning the economic value of a plaintiff's loss of enjoyment of life." *Sena v. N. M. State Police*, 1995-NMCA-003, ¶ 29, 119 N.M. 471, 892 P.2d 604. As to CYFD's argument regarding the proper standard for admission of testimony by an economic expert, we note that CYFD conceded in the district court that the *Alberico/Daubert* standard did not apply to expert testimony by an economist that is based on experience and training. *See State v. Torres*, 1999-NMSC-010, ¶ 43, 127 N.M. 20, 976 P.2d 20 (concluding that "application of the *Daubert* factors is unwarranted in cases where expert testimony is based solely upon experience or training." (internal quotation marks and citation omitted)). We agree that the district court did not err in not applying the *Alberico/Daubert* standard for scientific reliability of the economist's testimony. *See Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1245-46 (10th Cir. 2000) (holding that the district court did not err in admitting testimony by Stan Smith even though it did not perform a *Daubert* analysis); *Gurule v. Ford Motor Co.*, No. 29,296, mem. op., 2011 WL 2071701, ¶ 8 (N.M. Ct. App. Feb. 17, 2011) (non-precedential) (holding that testimony by an

economist on hedonic damages was not subject to the "*Alberico* standard of scientific reliability" (internal quotation marks and citation omitted)).

{51}    Instead, CYFD argued in the district court that the main question before the district court was whether "th[e] evidence [presented by Smith would] be of assistance to . . . the trier of fact." This argument rests on CYFD's contention that Smith's testimony was essentially speculative because it was based on the Mercer-Smiths' own estimates of their loss of enjoyment and assumptions about what might have happened in the relationship between the girls and their parents in the future. As the district court observed, however, the basis of Smith's opinions provided rich fodder for cross-examination. Simply because Smith's calculations were based on self-reports by the Mercer-Smiths does not render them inadmissible here.

{52}    To the extent CYFD argues that Smith's testimony impermissibly intruded on the realm of the factfinder, we disagree that Smith's testimony "crosse[d] the line between the permissible and impermissible [by] attempt[ing] to define the legal parameters within which the [factfinder] *must* exercise its fact-finding function." *Smith*, 214 F.3d at 1246 (internal quotation marks and citation omitted). Smith testified in some detail about his model for calculating the value of a loss of enjoyment of life and loss of services, the assumptions he employed, the inputs he received from the Mercer-Smiths, and the studies on which the model was based. He

testified that the report he provided included several calculations intended as a guide for the district court but did not offer an opinion as to the value the district court should adopt. Furthermore, the district court did not adopt any of the damages figures from Smith's report. The report provided estimates of the damages based on the Mercer-Smiths' report of their percentage of loss of enjoyment as well as estimates based on a percentage of half that amount. The district court's award was less than the lower estimate from Smith's report and did not include any damages related to loss of services by Julia and Rachel. We discern no error in admission of this testimony.

## 5.    Tort Claims Act

{53}    CYFD next argues that the Mercer-Smiths' claim for damages is akin to a tort claim and that it is "not actionable pursuant to the New Mexico Tort Claims Act [(NMTCA)] as there is no waiver of immunity." It also argues that, if this Court concludes that sovereign immunity does not preclude damages, the damages should be limited to the statutory cap in the NMTCA. Neither of these arguments is availing.

{54}    The district court's contempt power derives from the judicial branch's inherent power to compel compliance with its orders. *Greenwood*, 1957-NMSC-071, ¶ 17 ("[T]he power to punish for contempt is inherent in the courts and its exercise is the exercise of the highest form of judicial power."). "The real basis of this power is to

37

be found in the doctrine of separation of powers as provided for in the Organic Act and later in the New Mexico Constitution." *Id.* Such power is not absolute and may be circumscribed by the legislature to a limited extent. *Id.* ¶ 18. Thus, although "the [L]egislature may provide rules of procedure which are reasonable regulations of the contempt power it may not, either by enacting procedural rules or by limiting the penalty unduly, substantially impair or destroy the implied power of the court to punish for contempt." *Id.* When the legislature acts to regulate the court's contempt power, we examine "the reasonableness of the legislative regulation." *Id.* ¶ 19. Ultimately, "[t]he statutory regulation must preserve to the court sufficient power to protect itself from indignities and to enable it effectively to administer its judicial functions." *Id.*

{55} Common law sovereign immunity was abolished by the New Mexico Supreme Court in 1975. *Hicks v. State*, 1975-NMSC-056, ¶ 9, 88 N.M. 588, 544 P.2d 1153 ("Common law sovereign immunity may no longer be interposed as a defense by the [s]tate, or any of its political subdivisions, in tort actions."). Later cases clarified that the holding in *Hicks* "generally abolished the common law doctrine of sovereign immunity in all its ramifications, whether in tort or contract or otherwise." *Torrance Cnty. Mental Health Program, Inc. v. N. M. Health & Env't Dep't*, 1992-NMSC-026, ¶ 14, 113 N.M. 593, 830 P.2d 145. In response, the Legislature passed the NMTCA,

38

which "grants all government entities and their employees general immunity from actions in tort, but [also] waives that immunity in certain specified circumstances." *Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, ¶ 8, 140 N.M. 205, 141 P.3d 1259; *see* NMSA 1978, §§ 41-4-1 to -30 (1976, as amended through 2013). CYFD argues that the sovereign immunity granted to state agencies by the NMTCA immunizes it from being held in contempt of court.

{56}     There are two reasons why this argument fails. First, the plain language of the NMTCA "grant[s] immunity from liability for any *tort*" and nothing in the NMTCA addresses immunity from contempt of court. Section 41-4-4(A) (emphasis added). To the extent that CYFD argues that the NMTCA applies because the damages here "are in the nature of a tort claim," we are unpersuaded. Simply because contempt compensatory damages are similar to tort damages does not mean they are governed by the NMTCA. Second, accepting CYFD's argument would mean that the Legislature effectively "destroyed" the district court's ability to find state agencies in contempt and provide a remedy therefor, a clear and improper infringement on the inherent power of the judicial branch. *See Greenwood,* 1957-NMSC-071, ¶ 18. For these reasons, we reject CYFD's assertion that it is immune from the district court's contempt power under the NMTCA. *See generally State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶ 62, 125 N.M. 343, 961 P.2d 768 ("It is clear this Court has

authority to implement the full extent of contempt sanctions against executive branch members, including fines and imprisonment."); *Baca*, 1995-NMSC-033, ¶¶ 22-23 (commenting that attorney fee awards have a compensatory aspect and stating that a court may award attorney fees against the state for contempt).

{57} CYFD makes a cursory argument that, even if it is not immune from liability under the NMTCA, any liability "must be limited to the statutory caps for a single occurrence under the [NM]TCA." We disagree. As presently configured, the NMTCA does not govern the district court's power to hold the State in contempt in any way, including limiting the amount of damages that might be awarded.

**6.      Attorney Fees**

{58} CYFD argues that the attorney fee award "should be substantially reduced, as the attorney fees and costs submitted by [the Mercer-Smiths] were excessive, duplicative, incomplete, not reasonable[,] and many costs were not allowable pursuant to Rule 1-054 [NMRA]." It makes several arguments on this issue. First, it argues that an award of attorney fees against the state is improper except where the litigation was "frivolous or vexatious." It cites to *Baca*, 1995-NMSC-033, ¶ 12, for this proposition. But CYFD has simply cherry-picked this favorable phrase from the *Baca* opinion. In the same sentence quoted by CYFD, the *Baca* Court stated that attorney fees are appropriate "to vindicate [the court's] judicial authority." *Id.* In

addition, the *Baca* Court adopted the rationale in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991), in which the U.S. Supreme Court stated that courts have "the power to award attorney[] fees as a sanction for bad faith or vexatious litigation *or for defiance of a court order*." *Baca*, 1995-NMSC-033, ¶ 12 (emphasis added). Reading these cases in their entirety, it is clear that attorney fees against the state are permissible when the state defies a court order, not just for frivolous or vexatious claims.

{59}     Second, CYFD argues that the district court should have disallowed attorney fees incurred after entry of the contempt order. CYFD points to *El Paso Production Co.* for the proposition that only attorney fees related to prosecution of a contempt order may be awarded. It apparently finds this rule in the Court's statement that, after finding contempt, "[t]he court . . . may award attorney[] fees incurred in obtaining the order of contempt." 1993-NMSC-075, ¶ 31. But this reading of *El Paso Production Co.* ignores the Court's previous statement that "once a plaintiff satisfies his burden of proving violation of a court order, proximate cause, *and damages*, he or she is entitled to judgment for recovery of those damages." *Id.* (emphasis added). Thus, proving damages is part and parcel of a contempt proceeding. Furthermore, there is nothing talismanic about the entry of a contempt order that cuts off damages related to the contempt incurred after entry of the order. In *Spear*, this Court held that a

41

compensatory award of $25,000 was not an abuse of discretion where the funds were earmarked to pay for anticipated future litigation made necessary by the contempt. 1996-NMCA-048, ¶ 44; *see In re Hooker*, 1980-NMSC-109, ¶ 1, 94 N.M. 798, 617 P.2d 1313 (affirming a compensatory contempt award for attorney fees, including fees incurred subsequent to entry of the contempt order).

{60} Third, CYFD argues that the district court erroneously awarded attorney fees and costs associated with defense of the abuse and neglect petition. As support, it directs us to an affidavit submitted by its fee expert and presented to the district court which stated that a portion of the fees requested were related to the abuse and neglect petition. But the Mercer-Smiths presented their own affidavits denying that the fee request included any fees unrelated to the contempt proceedings. "[W]hen there is a conflict in the testimony, we defer to the trier of fact." *Buckingham*, 1998-NMCA-012, ¶ 10. Given that there is evidence supporting the district court's finding that the attorney fees requested were incurred in "investigating and prosecuting the contempt proceedings," we see no abuse of discretion in this regard.

{61} Finally, CYFD makes a generalized attack on the attorney fee award by citing to its pleadings below, which it asserts alerted the district court to "example after example" of unallowable costs. Absent specific allegations and citations, we decline CYFD's invitation to search the record for errors in the district court's attorney fee

42

award.[5] We conclude that the district court did not abuse its discretion in the award of attorney fees to the Mercer-Smiths.

**7.      Peremptory Excusal**

{62}      On January 4, 2010, the present matter was reassigned to Judge Michael Vigil as part of a mass reassignment of cases by the chief judge under Rule LR1-203(A) NMRA. On January 12, 2010, Judge Barbara Vigil, who had overseen the case since 2001, On appeal, CYFD argues that the district court erred in denying CYFD's motion to reassign the case to another judge, or for leave to file a peremptory excusal. As we understand it, CYFD's argument boils down to its assertion that the January 12, 2010, order reassigning the case to Judge Barbara Vigil was void because it was contrary to LR1-203(A) and Rule 1-088.1 NMRA, and that the order is an indication that Judge Vigil "actively sought to retain jurisdiction over the case" because she was inappropriately "embroiled" in the proceeding.

{63}      We need not address these arguments, however, because the order denying CYFD's motion states that "[t]his matter was inadvertently administratively

---

[5]CYFD does specify one cost: a charge of $24,225 for a psychiatrist who did not testify at trial.  Other than asserting that this charge is not allowable, it makes no argument as to why such a charge is inappropriate in an award for contempt compensatory damages. We therefore do not address this issue. *Headley*, 2005-NMCA-045, ¶ 15 ("We will not review unclear arguments, or guess at what [a party's] arguments might be.").

43

reassigned from Judge Barbra J. Vigil to Judge Michael E. Vigil as part of a mass reassignment" and that "[b]ecause the administrative reassignment was merely an administrative error, the transfer is rendered a nullity and the case shall remain assigned to Judge Barbara Vigil." The order further states that "Judge Barbara Vigil's continued assignment to the matter is not prejudicial to any party." The order was signed by Judge Barbara Vigil, Judge Michael Vigil, and Judge Stephen Pfeffer, who was the chief judge at the time. Given the concurrence of three judges that the reassignment was an administrative oversight, we perceive no error in the denial of CYFD's motion.

## III. CONCLUSION

{64} For the foregoing reasons, we affirm the district court's contempt order and award of damages. Consistent with the reasoning behind the district court's award of attorney fees, we conclude that the Mercer-Smiths are entitled to attorney fees on appeal. We therefore remand to the district court for calculation of reasonable attorney fees.

{65} **IT IS SO ORDERED.**

_____

**MICHAEL D. BUSTAMANTE, Judge**

44

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Chief Judge**

_____

**M. MONICA ZAMORA, Judge**